**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SEAN COMBS,

Plaintiff,

    -against-

COURTNEY BURGESS, ARIEL MITCHELL, and
NEXSTAR MEDIA INC.,

Defendants.

Civil Action No. 25-cv-650

**FIRST AMENDED
COMPLAINT**

**JURY TRIAL DEMANDED**

      Plaintiff Sean Combs ("Mr. Combs"), by and through his undersigned counsel, Sher

Tremonte LLP, for his First Amended Complaint against Courtney Burgess ("Burgess"), Ariel

Mitchell ("Mitchell"), Nexstar Media Inc. ("NewsNation") (collectively "Defendants"), alleges

as follows:

**NATURE OF THE ACTION**

      1.    This case is about Defendants' willful schemes to fabricate and broadcast

outrageous lies concerning Mr. Combs and then to leverage those falsehoods to enrich

themselves, gain social media fame, promote their brands, strip Mr. Combs of his reputation and

livelihood, and jeopardize his right to a fair trial.

      2.    Social media protagonists, including but not limited to Defendants Burgess and

Mitchell, have for over a year been fueling a media frenzy, fabricating outlandish claims, and

stirring up baseless speculation about Mr. Combs, vying to outdo each other in a shameless

competition to draw attention to themselves, with no regard for the truth.  In this pitiful

spectacle, all pretense of objectivity has been abandoned, as a global audience feasts at the all-

you-can-eat buffet of wild lies and conspiracy theories.  Defendants Mitchell and Burgess are

among the worst perpetrators in this offensive scenario.  They eagerly court every opportunity to

1

broadcast blatant falsehoods, pretending they have proof that Mr. Combs engaged in heinous acts, knowing that no such proof exists.

3.      Defendant NewsNation, rather than uphold standards of professional journalism and act as a bulwark against such social media fabrications, instead lent its credibility to and amplified Defendant Burgess and Mitchell's lies, giving them a mainstream media platform to malign Plaintiff for Defendants' collective profit.

4.      As a result, millions of people have come to believe in the made-up "evidence" that Defendants have falsely described and vouched for.  The torrent of lies, and the immeasurable harm and prejudice it has caused to Mr. Combs, must be remedied.

5.      Defendant Burgess falsely claimed that he possessed videos of Mr. Combs involved in the sexual assault of celebrities and minors.  Defendant NewsNation recklessly repeated and amplified his lies as if they were true, even though NewsNation was aware that what he was spewing was probably false.  As a result, Burgess's lies were rebroadcast on social and traditional media platforms that reach millions of viewers in the United States and abroad.

6.      Burgess's attorney, Mitchell—who was recently named in a complaint by the Florida Bar based on allegations that she bribed a witness to corroborate accusations of sexual assault against a celebrity—repeated those lies.  Mitchell knew that her client's claims were false, or at a minimum was utterly reckless in disregarding their falsity.  Because no such tapes exist, and because Mitchell never saw any video depicting Mr. Combs sexually abusing anyone, adult or minor, Mitchell's many false assertions that Burgess possessed such videos were either knowingly blatant falsehoods or recklessly false statements made as the direct result of Mitchell's inexcusable failure to investigate her client's outrageous lies.

7.      Mitchell also knowingly published false statements about Plaintiff on national television in connection with her representation of another client. Discussing a California woman who had made outlandish allegations of a coordinated, pre-meditated, violent rape, Mitchell falsely asserted that a police report corroborated her client's allegations that Mr. Combs raped her on a specific day in March 2018. In truth, no such police report exists. Contrary to Mitchell's published statements, an actual police report filed by her client thoroughly discredited the client's preposterous accusations against Mr. Combs: it alleged that the client was tragically raped by two *white* men, not by Mr. Combs, who is Black. Even those allegations were deemed unsubstantiated by the police.

8.      Again, NewsNation, published these lies about Mr. Combs even though it knew or recklessly disregarded the fact there was no such corroborating police report.

9.      Burgess peddled his false and defamatory statements about Mr. Combs to promote himself on social media. Mitchell did the same. Both seek to capitalize on the resulting publicity for financial gain, and both must be held accountable.

10.      NewsNation disseminated Burgess and Mitchell's false statements, despite multiple reasons to seriously doubt the truth of their claims. Given Burgess's and Mitchell's reputations for peddling falsehoods, the outlandish nature of their statements, as well as publicly available information discrediting their claims, NewsNation should have realized that Burgess and Mitchell's statements were inherently improbable.

11.      Together, Burgess, Mitchell, and NewsNation have caused profound reputational and economic injury and severe prejudice to Mr. Combs. In this action, Mr. Combs seeks money damages, including punitive damages, for the severe harms the Defendants' false and defamatory statements have inflicted on him.

## THE PARTIES

12.     Plaintiff Sean Combs is an individual who presently resides in Brooklyn, New York.

13.     Defendant Courtney Burgess is an individual who, upon information and belief, is a resident of New Jersey or Maryland.

14.     Defendant Ariel Mitchell is an individual who, upon information and belief, is a resident of Miami, Florida and conducts business in New York.

15.     Defendant Nexstar Media Inc. is, upon information and belief, a Delaware corporation with its principal place of business located at 545 East John Carpenter Freeway, Suite 700, Irving, TX 75062.

## JURISDICTION AND VENUE

16.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because complete diversity is present and because the amount in dispute exceeds $75,000.

17.     The Court has personal jurisdiction over Defendants because they were present in New York when they made false and defamatory statements that injured Mr. Combs; because they directed their false and defamatory statements about Mr. Combs to individuals in New York, among other places; because they caused harm to Mr. Combs in New York, among other places; because Defendant Mitchell does business in New York; and because Defendant Nexstar Media Inc. conducts business in New York, including through the filming and distribution of its program "NewsNation" in New York.

18.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to Mr. Combs's claim occurred in the Southern District of New

York, including the publication of the defamatory statements here.  Mr. Combs has been
damaged in his business, personal and professional reputation, and enjoyment of fundamental
rights in this District.

## FACTUAL BACKGROUND

19.     Sean Combs became famous for his extraordinary and historic achievements as a
musician and music producer, hip hop impresario, record label owner, fashion innovator and
icon, pathbreaking spirits entrepreneur, and committed philanthropist.  Mr. Combs is among the
most accomplished businessmen of his generation.

20.     In September 2024, Mr. Combs was indicted in the Southern District of New
York on federal racketeering and sex trafficking charges.  Mr. Combs entered a plea of not guilty
to those charges on September 17, 2024, and emphatically and unequivocally denied that he was
guilty of sex trafficking or racketeering.

21.     Following an eight-week trial in the Southern District of New York, a jury
acquitted Mr. Combs of sex trafficking and racketeering in July 2025.  Neither the criminal
indictment, the trial, nor the verdict involved allegations or findings of sexual assaults of minors
or the use of hidden cameras.  The government did not call Burgess as a witness at trial, nor did
it present any video evidence matching the description of the videos Burgess claimed he
possessed and provided to the government.

***Burgess's Unreliable Reputation and Defamatory Statements on Social Media***

22.     Defendant Burgess has been described as "a one-time industry bit player" and "a
fringe character."  In the past year, seeking to capitalize on the media's insatiable appetite for
celebrity scandal, Burgess has gone to great lengths to invent and publicize outrageous
falsehoods about Mr. Combs.  In media interviews, Burgess claims he has worked in the music

industry for decades, yet there exists no public record of any professional achievements and he left no detectable footprint on the industry prior to his recent campaign to malign Mr. Combs. His malicious conduct, which according to the New York Times "has only amped up the circuslike frenzy surrounding [Mr. Combs's] case," is intended to garner publicity and profit from the attention surrounding Mr. Combs's legal proceedings.

23.     Burgess has never met Mr. Combs and has never had any relationship with anyone in Mr. Combs's family.  Nevertheless, Burgess has claimed on multiple occasions that Kim Porter, the mother of four children with Mr. Combs who died in 2018, provided him with a copy of her memoir and videos depicting Mr. Combs sexually assaulting inebriated celebrities and minors.  Those close to Ms. Porter, including her children and her roommate for over twenty years, had never heard of Burgess before he made this utterly implausible and completely false claim.

24.     Burgess has made this false claim numerous times to the press and in social media appearances.  In one such interview, broadcast on or about October 31, 2024 on the "Attwood Unleashed" YouTube channel, Burgess elaborated on his false claim that he received these materials directly from Kim Porter.  Host Shaun Attwood, whose YouTube channel boasts 946,000 subscribers (including, upon information and belief, numerous subscribers in New York, as Burgess, upon information and belief, must have known), introduced Burgess in one interview by noting that he "has certainly been making waves on the Internet."  Attwood also noted that "we've had so much interest in this one."

25.     On the broadcast, Burgess falsely claimed that Ms. Porter enlisted the help of a music industry mutual acquaintance to put her files in Burgess's hands.  Specifically, Burgess claimed that this individual called Burgess and told him, "I got something for you, Kim told me

to give you something. . . She's got something she wants you to work with." Burgess went on to claim, again falsely, that the same individual later met Burgess in New York and delivered to him the first of several flash drives containing the memoir and videos that Ms. Porter supposedly intended for him to have, even though (even according to Burgess) Ms. Porter had no more than a passing acquaintance with Burgess.

26.    During the interview, Attwood posted still images that Burgess insinuated had come from the videos that Burgess falsely claimed Ms. Porter had provided to him. They described one as depicting Justin Bieber, a famous recording artist, kissing an unidentified male. Attwood asked, "is this picture legit?" Burgess responded, "yes, yes, definitely." Scoville then asked Burgess, "how freaked out were you the first time you got a look at some of the images? Shocker or what?" Burgess responded that he was "freaked out because my daughter was a listener of Justin Bieber, you understand?" Burgess stated that Bieber "was a child" at the time. Burgess characterized Bieber as a "victim" who "loved it, loved being treated like that. And that's what happens sometimes when you're a kid." Burgess went on to compare Mr. Combs to "Lucifer," claiming that Mr. Combs, like Lucifer, "destroyed bodies, he destroyed careers. He could get you where you want to be at, but you're going to give up the back end."

27.    Burgess also commented on an image that appeared to depict Mr. Combs with his arm around an adult woman's shoulder. Scofield falsely suggested that the photograph evidenced sexual misconduct with minors: "Yeah, it's just, uh, it's disturbing how, uh, the number of people who appear to be underage in all of these things. You know they, I think that's probably what we're going to see on these superseding indictments. It's gotta be, man. It just keeps coming back to the underage thing again and again and again. It's terrifying." Burgess and Scofield's statements about these images on the "Atwood Unleashed" broadcast were

specifically and maliciously intended to convince viewers, falsely, that Burgess possessed and Attwood and Scofield had seen evidence that Mr. Combs had engaged in sexual abuse of celebrities and minors, even though they knew those claims were false when they made them.

28.    On the same broadcast, Burgess insinuated, falsely, that talking about Mr. Combs and the fake memoir and videos put him in danger for his life.  Burgess also described his efforts to market the fake Porter memoir on Amazon.com, which he initially gave the ghoulish title "Kim's Lost Words."

29.    As word of the purported memoir had circulated, Kim Porter's children and best friend publicly discredited Burgess's claims that he had received personal files of Ms. Porter's, posting on social media and informing the press that Ms. Porter had never written a memoir or maintained a journal.  On or about September 25, 2024, Ms. Porter's children released a statement including the following confirmation that Burgess was lying:  "Claims that our mom wrote a book are simply untrue. She did not, and ***anyone claiming to have a manuscript is misrepresenting themselves***." (emphasis added).

30.    After the book was denounced by Ms. Porter's family and others as a fake, Amazon pulled the volume from its website on or about October 3, 2024.  Subsequently, Burgess marketed another, equally false and defamatory version of the book, titled "Kim Porter – Tell It All," on a different website, www.jamal-millwood.com.  Burgess described the second version as "R rated," in contrast to the earlier "PG version" of the fake memoir.

31.    Upon information and belief, sometime in or around September 2024, Burgess contacted Mitchell seeking to team up with a lawyer in an attempt to legitimize and/or profit from his outrageous lies.

*Mitchell's Unreliable Reputation*

32.    Mitchell is a civil litigator at her eponymously named law firm.  On her firm's

website, she boasts that her "practice . . . focus[es] on high profile cases" including claims of

"sexual assault perpetrated by a celebrity."   A recent complaint filed against Mitchell by the

Florida Bar similarly observed that Mitchell "represents individuals who allege they have been

sexually assaulted by celebrities."

33.    In connection with one such representation, in or around 2021, Mitchell brought a

lawsuit against Plaintiff and the celebrity musician Trey Songz on behalf of a woman claiming

sexual assault by Trey Songz.  Plaintiff was dismissed as a defendant from that lawsuit in its

early stages.  In 2022, a witness in that lawsuit testified that Mitchell tried to bribe her to lie

about witnessing the purported assault and being assaulted herself.  In connection with those

allegations of professional misconduct, three complaints were filed with the Florida Bar accusing

Mitchell of engaging in witness tampering.

34.    In addition, on or about February 15, 2022, Trey Songz's lawyer publicly filed a

motion for sanctions against Mitchell, seeking dismissal of her client's lawsuit.  The court

hearing that sanctions motion ultimately declined to award sanctions, characterizing the evidence

before it as a "classic 'she said versus she said' scenario."  The court did not resolve the ultimate

factual issue of the alleged bribe.  But the court noted "it does not speak on behalf of the Florida

Bar."

35.    Thereafter, the Florida Bar filed a complaint against Mitchell arising out of the

complaints that she had attempted to bribe a witness to corroborate allegations of sexual assault

against a celebrity.  The Florida Bar concluded that Mitchell had violated multiple rules of

professional conduct, including with respect to "Truthfulness in Statements to Others" and "Dishonesty, Fraud, Deceit, or Misrepresentation."

36.     As described by the Florida Bar, the witness in question had signed a sworn declaration describing how Mitchell claimed to have "contacted several paparazzi and news media outlets" about her client's claim, and told the witness those media organizations would pay her for her "story."

37.     In its complaint against Mitchell, the Florida Bar found that she had repeatedly misrepresented to the media the status of the complaints against her, falsely telling multiple news outlets in February 2022 that the Florida Bar had taken "no action" in connection with the witness tampering complaints when, in fact, the Florida Bar's investigation into Mitchell's witness tampering was still open.

38.     The Florida Bar also found Mitchell had violated ethics rules concerning truthfulness and deceit in her defense against the sanctions motion filed by Songz.  In particular, the Florida Bar's investigation showed that, in an attempt to discredit the witness who swore she had been offered a bribe, Mitchell falsely asserted the witness had "drank heavily" during their meeting and that Mitchell had not been drinking at all.  Contrary to Mitchell's representation to the court, a receipt from the establishment where that meeting occurred showed that the witness had only had one drink, and that Mitchell had also had a drink.  The Florida bar found "[t]his receipt conclusively demonstrated that [Mitchell] made an affirmative misrepresentation in her attempt to impeach [the] witness."

39.     For her repeated lack of candor to the media and to at least one court, the Florida Bar has requested that Mitchell be disciplined.  Other allegations brought by Mitchell against celebrities have similarly been publicly discredited.  In or around 2022, Mitchell brought a $20

million lawsuit against the rapper Chris Brown on behalf of a woman claiming Brown raped her. After Brown posted a series of text messages and voicemails reflecting a consensual relationship with the plaintiff, Mitchell withdrew.

40.    In the summer of 2024, Mitchell filed a lawsuit against Mr. Combs on behalf of an adult entertainer who alleged she had been sex-trafficked by Mr. Combs.  This lawsuit did not involve any allegations of hidden cameras or conduct involving minors.

41.    After filing the lawsuit, Mitchell launched a media tour in which she repeatedly offered to discuss allegations against Mr. Combs, including in an interview with TMZ Live, during which Mitchell sat in front of a propped-up copy of an issue of VIBE Magazine with Mr. Combs on the cover.

42.    Mitchell has brought at least two other lawsuits against Mr. Combs.  She has spoken about them extensively to the media.

43.    In exchange for press appearances to discuss the allegations against Mr. Combs, Mitchell has demanded luxury accommodations, including "first class flights" to New York City, a minimum two-night stay at "4 star minimum hotel," onsite hair and makeup services, meals and snacks, and an unspecified "materials fee."  She has insisted, moreover, that such interviews "must occur in New York City."

***Mitchell's, Burgess's, and Nexstar's Defamatory Statements on National Television***

44.    Mitchell has peddled numerous false claims about Plaintiff to various media outlets.

45.    For example, in a television interview with NewsNation (upon information and belief at its studio in New York City) that was broadcast on or about September 27, 2024, Mitchell falsely stated that "there already have been tapes leaking around Hollywood, being

shopped around to individuals in Hollywood."  Presumably referencing Burgess or one of his

affiliates, Mitchell continued: "one particular person contacted me to shop a particular video they

were in possession of and to contact the person who was in the video to see if they were

interested in purchasing the video before it became public knowledge."  Mitchell described the

request as a "catch and kill" and stated that "Mr. Combs was in the tape and this other person

was, I would venture to say, more high profile than Mr. Combs."  Mitchell falsely confirmed that

the video "exists, that it's real, that the other person in the video is very visible, it's no question if

it's that person in the video, and I can tell that the video is pornographic in nature."

46.    With no evidentiary support, the NewsNation host, speaking about Mr. Combs,

then falsely said to Mitchell: "[I]t sounds like there was probably a lot of hidden cameras as

well."

47.    Mitchell falsely confirmed this and then further stated that, based on her review of

the supposed false evidence, it "doesn't seem like the person knows they're being videotaped . . .

[it is] like they're being surreptitiously recorded."

48.    These statements by Mitchell and NewsNation were false.  Mitchell never

possessed "surreptitiously recorded" "pornographic" images involving Mr. Combs and any

celebrity and was never able to confirm the existence of any such video of Mr. Combs and thus

knew or recklessly disregarded that her statements were false when she made them.

49.    NewsNation, upon information and belief, conducted no investigation before

broadcasting the false allegations, though it easily could have done so.  When NewsNation

published Mitchell's false statement and when its host affirmatively stated that it "it sounds like

there was probably a lot of hidden cameras" recording Mr. Combs having sex with partners who

did not know they were being filmed, NewsNation was highly aware that such statements were

probably false because of Mitchell's already documented history of making false claims against celebrities and her obvious lack of credibility (as described above) and because NewsNation never saw any such videos.

50.     NewsNation and Mitchell promoted this false narrative without any credible evidence to support it to feed the public's insatiable appetite for celebrity scandal and line their own pockets.

51.     Mitchell also told NewsNation on that broadcast about another client – a woman who alleged that Mr. Combs sexually assaulted her in Northern California in 2018.  This client's allegations are also false.

52.     Mitchell falsely represented that her client's fabricated claims were corroborated, even though Mitchell knew they were not.  Specifically, Mitchell falsely stated:  "We also have a police report . . . that was made in 2018."  Later in the interview, the NewsNation host repeated Mitchell's assertion, emphasizing (about the purported police reports corroborating her client's claim): "you guys actually have one."  The host then asked: "Are we going to be able to see it?"

53.     Mitchell falsely confirmed that she would produce the report.  She told the NewsNation host:  "Yes, as soon as I file my lawsuit in civil court, I will be attaching the criminal complaint that was made."  These statements, in which Mitchell claimed on NewsNation to possess a police report corroborating her client's fabricated allegations, were false, and Mitchell and NewsNation knew they were false or, at a minimum, recklessly disregarded their falsity, when they made them.

54.     As Mitchell knew, there is no police report corroborating Mitchell's client's claim against Mr. Combs.  To the contrary, the police report that Mitchell's client actually filed thoroughly undermines her and Mitchell's subsequent, fabricated allegations.  The actual police

report, which Mitchell's client filed approximately one month after the March 2018 date in question, stated that Mitchell's client was tragically raped by Shane Pearce and another white man. The actual police report does not mention Mr. Combs, who is Black. Mitchell's client publicly filed the actual report together with a sworn statement confirming its substance.

55.    Roughly two weeks after the NewsNation broadcast, Mitchell filed the lawsuit she had previewed. Contrary to her false assertions, the lawsuit did not attach any police report, presumably because the events described in the actual police report do not involve Mr. Combs at all and bear absolutely no resemblance to the outlandish tale of premeditated, violent gang rape spun in the complaint that Mitchell filed.

56.    Subsequently, the Walnut Creek Police Department denied having any involvement in the allegations made by Mitchell's client. And the Contra Costa County Sheriff's Office released a statement that they had "thoroughly investigated the accusations" and "determined the claims were unfounded."

57.    NewsNation broadcast its September 27, 2024, interview with Mitchell, a known fabricator, without fact checking Mitchell's false and injurious accusations. NewsNation did not even reach out to Mr. Combs's representatives for comment. NewsNation did nothing to confirm the existence of a police report corroborating Mitchell's client's claims. If it had, NewsNation would have realized that there was no such police report and that the only police report by this plaintiff about the day in question was completely inconsistent with the accusations she was making against Mr. Combs.

58.    The actual police report was publicly available at the time NewsNation and Mitchell published their false statements about it and the events it describes. Mitchell's client had filed that actual police report along with a statement under penalty of perjury confirming

allegations that did not involve Mr. Combs at all (nor anyone who could be mistaken to be Mr. Combs) in connection with a domestic violence proceeding on or about July 8, 2019, five years before Mitchell and NewsNation went on national television and falsely stated that there existed a police report corroborating Mitchell's client's accusations against Mr. Combs.

59.    Mitchell knew or recklessly disregarded that her statements about the existence of such a corroborating report were false because no such report existed and, in fact, the actual report that was filed, and which was available to the public, thoroughly discredited her client's outlandish claims against Mr. Combs.

60.    NewsNation likewise knew or recklessly disregarded that its statements about the existence of such a corroborating police report were false because, given Mitchell's history of fabricating claims against celebrities, NewsNation had every reason to doubt the veracity of her allegations against Mr. Combs and because no such report existed and, in fact, a report that did exist (and which was available to the public) thoroughly discredited Mitchell's client's claims against Mr. Combs.

61.    The actual police report was also publicly filed again on May 9, 2025, by a co-defendant in the California federal district court case filed by Mitchell on behalf of her client, in a motion seeking sanctions against Mitchell for the frivolous lawsuit.  And it was further described in a filing in this Court made by Plaintiff on May 21, 2025, in response to NewsNation's letter concerning its anticipated motion to dismiss this lawsuit.

62.    Despite knowing the only police report by Mitchell's client involving the date in question undermined rather than corroborated heinous allegations against Mr. Combs, NewsNation has, to date, still not corrected the false statements it published on September 27,

2024.  This is despite a January 19, 2025 NewsNation follow-up interview with Mitchell and her client about allegations involving the 2018 police report.

63.     On or about October 31, 2024, Mitchell appeared on NewsNation again, this time with her client, Burgess, on NewsNation's "Banfield" show (upon information and belief, at NewsNation's studio in New York, New York), which is also broadcast on YouTube.  The host introduced the interview by announcing that Burgess "just testified before a federal grand jury. He says he was in possession of a trove of digital evidence of Diddy's 'freak offs' and parties. His name is Courtney Burgess, and he says a friend gave him 11 flash drives that belonged to the late Kim Porter . . . Diddy's ex-girlfriend and the mother of four of his kids.  On those drives, the witness says, eight videos featured eight celebrities at Diddy 'freak offs' or parties and that six were males, two were females."

64.     The host went on to note that "because the eight people in the videos, the eight celebrities in the videos were allegedly victims of sex crimes, we know who they are, but we will not be naming them, famous or not."  This statement was false, and the NewsNation host knew it was false or, at a minimum, recklessly disregarded whether the statements were true or false because she had never seen such videos (because they do not exist) and because a host of publicly available information put her on notice that her sources, Burgess and Mitchell, were not credible.

65.     Although the host observed that Burgess had testified before the Grand Jury, the segment did not describe those Grand Jury proceedings, nor could it.  As is commonly known, Grand Jury proceedings are secret.  What the segment described were Burgess's false claims that he was in possession of video tapes of Mr. Combs sexually assaulting minors and celebrities.

66.     In response to the host's questioning, Burgess falsely stated that "all" eight celebrities "who were recorded having intimate relations with Sean Combs," "two to three, possibly three" appeared to be minors, "all" appeared inebriated, and "all, to be honest" were "victims" of sexual assault.

67.     Burgess also repeated his false statements about the fake memoir.  The host asked him: "Do you know if the notes from the book really were from Kim Porter?"  Burgess responded: "Yes, because I spoke to her probably like six hours before I got it, received it."

68.     In another interview, Burgess claimed that federal law enforcement seized the flash drives from his home.  This too was false.

69.     NewsNation knew that these statements were false when it published them or, at a minimum, was highly aware that they were probably false and recklessly disregarded their falsity because, among other things, Burgess was a highly dubious source with questionable motivations whose credibility was in serious doubt (as explained above), the allegations he was making about having come into possession of such sensitive materials from the then-deceased mother of Mr. Combs's children were facially improbable, including because as of that date, Ms. Porter's children had already publicly denied Burgess' claims and confirmed he was "misrepresenting" himself, and because NewsNation, of course, had not seen any such videos or flash drives (because none existed).

70.     Mitchell made statements throughout the interview that were unambiguously intended to convince viewers not only that Burgess was telling the truth, but also that she had independently corroborated his claims and was vouching for him.  Mitchell made similar statements, on or about the same day as the "Banfield" YouTube broadcast, during a separate interview she and Burgess gave outside of federal district court in Manhattan.  In that interview,

the reporter asked: "I know you can't mention celebrities per se.  You did mention some in the interview.  So, just to clarify, you can back that up with actual factual footage?"  Mitchell responded: "We have, yeah, it's things that we have."  Mitchell intended this statement to convince viewers that Burgess's false claims about Mr. Combs were true, even though she knew or recklessly disregarded at the time that his claims were false.

71.     In her shameless pursuit of the spotlight, Mitchell repeated these known lies in a documentary *The Making of a Bad Boy* that aired on NBC's streaming platform Peacock on January 14, 2025.  In that documentary, Mitchell endorsed the ludicrous allegations of her client Burgess, stating that Burgess "has done interviews where he purported to own several flash drives that included sex tapes with eight distinct individuals, including a-list celebrities and Diddy, all engaged in sex.  He believes that these people were intoxicated and that they may not have known that they were being recorded."  Then, explicitly endorsing Burgess's known lies as truths, Mitchell added, "And Courtney ultimately handed over the video" to the federal government.  These statements were completely false.  Mitchell knew, or at a minimum recklessly regarded, that these statements were false because no such video was ever turned over to the government because no such video exists and because there were numerous reasons for Mitchell to doubt Burgess's credibility, including that Ms. Porter's children had confirmed his claims of having received sensitive information from their mother were false and that he was "misrepresenting" himself.

72.     Mitchell did not stop there.  She continued to lend credence to Burgess's lies, asserting that Mr. Combs took these videos (which she knew did not exist) so that he could wield power over the purported subjects: "[I]t was to advance his influence and his power.  Because

now I have them on video, where I can say, I'm going to take this to your wife.  I'll take this to

your husband.  I'll take this to the public.  And I'll ruin you if you don't do this for me."

73.     During the interview in *The Making of a Bad Boy*, Mitchell asserted, with no basis

in fact and with utter disregard for the truth that Mr. Combs "is a man who has done awful things

to hundreds, maybe thousands of people."

74.     On October 7, 2024, on NewsNation's "Banfield" show, Mitchell also falsely

claimed that she had done "research" indicating that baby oil may be used as a "conduit" for

transmitting drugs "mixed into the oil" to another person for the purpose of incapacitating them.

75.     Mitchell suggested, moreover, that Mr. Combs did this to one of her clients—*i.e.*,

mixed drugs with baby oil and doused her client with it, thereby "lowering her defenses."  That

statement was a lie.  Mitchell performed no such research, and even if she had, there is no

scientific basis for asserting that baby oil could be infused with drugs to incapacitate anyone, so

it was, at a minimum, reckless to say otherwise.  Additionally, there was no evidence presented

at Mr. Combs's criminal trial that any baby oil was used as a conduit for transmitting drugs.

Instead, the evidence at Mr. Combs's criminal trial proved that the baby oil was purchased

directly from stores.  Again, Mitchell knew or should have known that her statements were false

when she made them.

76.     Defendants eagerly peddled these lies to enrich themselves.  Burgess has profited

from his fake Kim Porter memoir, which prior to being pulled down from the Amazon website

briefly rose to the top of its best-seller list.  Burgess's craven willingness to profit from the

fabricated memoir proves that he is callously indifferent to the emotional distress of Ms. Porter's

children and has nothing but contempt for the feelings of Ms. Porter's extended family and many

friends who were heartbroken by her untimely death.

77.    Mitchell has also sought to profit from her false and defamatory statements about Mr. Combs.  Mitchell has seized every opportunity to promote herself in the media and has insisted on valuable benefits and payments in exchange for interviews, including first class air travel, four-star hotel accommodations, hair and makeup allowances, and a "materials fee" for copies of, among other things, demand letters sent on behalf of one of her clients who sued Mr. Combs.

78.    NewsNation has likewise profited from repeating and amplifying Burgess's and Mitchell's lies, drawing viewers and promoting its programming based on wholly unsubstantiated lies that would have been revealed as false had NewsNation conducted even the most modest fact checking and/or reasonably questioned its sources who had a history of making things up.

79.    Defendants made false and defamatory statements about Mr. Combs knowing that they were false and with reckless disregard of their falsity.

80.    Defendants made these false and defamatory statements in bad faith, as part of a deliberate effort to damage Mr. Combs's reputation, undermine his businesses and, by painting him as debauched and a pedophile, to poison the public's perception of him and deprive him of a fair trial.

81.    Defendants had no good faith basis for claiming that Burgess possessed videos of Mr. Combs involved in the sexual assault of anyone.  Burgess purposefully made up the videos and told hideous lies about Mr. Combs, and Mitchell and NewsNation either knew that Burgess's claims were false or made no effort to verify the truth of those false claims and published the statements notwithstanding their probable falsity.

*Defendants' Malicious Lies Have Materially Injured Mr. Combs*

82.    As a result of Defendants' malicious lies, Mr. Combs has suffered significant reputational and economic harm.

83.    People who heard and believed Defendants' lies have accused Mr. Combs, on social media that is consumed by hundreds of millions of viewers each and every day, of being a debauched "monster" and a pedophile.  Moreover, many viewers of the social media posts in which Defendants' falsehoods are published and republished post harassing and threatening messages against Mr. Combs.  The unrelenting tide of negative publicity and threatening social media posts resulting from Defendants' lies have caused and will continue to cause Mr. Combs severe reputational harm.

84.    Defendants' intentionally false and defamatory statements have also poisoned the minds of the overwhelming majority of individuals residing in the Southern District of New York who could have qualified for jury service on the jury in Mr. Combs's trial beginning in May 2025.  Thus, in addition to all of the other harms resulting from Defendants' unlawful false statements, they also jeopardized his opportunity for a fair trial on the government's charges against him.

## FIRST CAUSE OF ACTION
### (Defamation)

85.    Plaintiff repeats and re-alleges each of the foregoing paragraphs as if fully set forth herein.

86.    Defendants made false and defamatory statements concerning Plaintiff.  As set forth in detail above, Defendants' defamatory statements included the following false assertions:

21

a.   That there existed video recordings of Plaintiff sexually assaulting minors and celebrities. Defendants Burgess, Mitchell, and NewsNation published such statements, as described more fully above, on or about October 31, 2024;

b.   That Plaintiff secretly recorded himself having sex with people who did not know they were being recorded. Defendants Mitchell and NewsNation published such statements, as described more fully above, on or about September 27, 2024 and October 31, 2024;

c.   That Plaintiff used secretly recorded videos of him having sex with people who did not know they were being recorded in order to threaten or extort sexual partners.   Defendant Mitchell published such statements, as more fully described above, on January 14, 2025;

c.   That a police report existed that corroborated the outrageous allegations made by Mitchell's client that she was raped by Plaintiff in Northern California in March 2018. Defendants Mitchell and NewsNation published such statements, as described more fully above, on or about September 27, 2024;

d.   That Combs used drug-laced baby oil to incapacitate people.   Such statements were published by Defendants Mitchell and NewsNation, as described more fully above, on or about October 7, 2024;

e.   That possessing the purported videos of Combs sexually assaulting minors and celebrities and possessing a tell-all memoir of the mother of Combs's children, put Burgess in danger for his life.   Defendant Burgess published statements, as described more fully above, on or about October 31, 2024; and

f.   That Plaintiff sexually assaulted and/or threatened, exploited, or secretly recorded in sex acts "hundreds, maybe thousands of people." Defendant Mitchell published such statements, as described more fully above, on January 14, 2025.

86.   These statements published by Defendants about Plaintiff accused Plaintiff of committing a serious crime and engaging in sexual misconduct.

87.    These statements published by Defendants about Plaintiff were defamatory per se.

88.     These statements published by Defendants caused substantial reputational and financial harm to Plaintiff, and damaged his right to a fair trial on the government's charges against him.

89.     Defendants published these statements without privilege to a third party, as more fully set forth above.

90.     The defamatory statements alleged herein were not made in good faith in the scope of any pre-litigation or litigation as the statements were not material and pertinent to any litigation or anticipated litigation and were unmeritorious and unsupported in fact.

91.     The defamatory statements alleged herein were not fair and true reports of any judicial proceedings included because, as set forth fully above, the broadcasts were not substantially accurate reports of any existing proceedings.

92.     Defendants published these statements with actual malice.  Defendants published these statements with knowledge of their falsity or reckless disregard for their veracity.

93.     As set forth more fully above, Defendants Burgess knew or, at a minimum, recklessly disregarded that the defamatory statements he made were false because, among other things, he did not possess the recordings he falsely claimed to possess, and no such recordings existed.

94.     As set forth more fully above, Defendant Mitchell knew or, at a minimum, recklessly disregarded that the defamatory statements she made were false because, among other things, she never saw the recordings she falsely claimed existed, no such recordings existed, she had ample reason to doubt the credibility of her clients' whose lies she repeated (including because Ms. Porter's children had publicly confirmed that Burgess was "misrepresenting" himself), there was no police report corroborating the claims that one of her clients was raped by

Plaintiff, the police report filed by that client thoroughly undermined those claims, and there is no evidence to support the facially implausible claim that Plaintiff used drug-laced baby oil to incapacitate anyone.

95.    As set forth more fully above, Defendant NewsNation knew or, at a minimum, recklessly disregarded that the defamatory statements it published were false because, among other things, NewsNation took no action to verify their sources or inspect underlying evidence despite reason to doubt the existence and accuracy of the videos and documents they falsely described, NewsNation never saw the recordings it falsely claimed existed, no such recordings existed, NewsNation had ample reason to doubt the credibility of its sources – Mitchell and Burgess – whose lies it repeated (including because Ms. Porter's children had publicly confirmed that Burgess was "misrepresenting" himself and because Mitchell had a history of making false claims in connection with her prosecutions of sexual assault against celebrities), there was no police report corroborating the claims that one of Mitchell's clients was raped by Plaintiff, and the police report filed by that client thoroughly undermined those claims.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment:

1.    Awarding Plaintiff money damages in an amount to be determined at trial, but not less than $100,000,000.00; and

2.    Granting such other and further relief as the Court deems just and proper.

### DEMAND FOR A JURY TRIAL

Plaintiff demands a jury trial.

Dated:  New York, New York
        August 11, 2025

_____

Michael Tremonte
Erica A. Wolff
SHER TREMONTE LLP
90 Broad Street, 23rd Floor
New York, N.Y.  10004
Telephone: (212) 202-2600
mtremonte@shertremonte.com
ewolff@shertremonte.com
*Attorneys for Plaintiff Sean Combs*