**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

SEAN COMBS,

                    Plaintiff,

       -against-

NBCUNIVERSAL MEDIA, LLC, PEACOCK TV LLC,
and AMPLE, LLC d/b/a AMPLE ENTERTAINMENT,

                    Defendants.

Index No. 151935/2025

**AMENDED COMPLAINT**

Plaintiff Sean Combs, by and through his undersigned counsel, Sher Tremonte LLP, for his Amended Complaint against NBCUniversal Media, LLC, PEACOCK TV LLC (together, "NBCU"), and AMPLE, LLC d/b/a Ample Entertainment ("Ample") (and collectively "Defendants"), pursuant to CPLR 3025(a), alleges as follows:

**NATURE OF THE ACTION**

1.     For nearly a century, NBC has been a trusted name in news, a leader in broadcasting important stories to citizens who depend on reputable media to stay informed. Grossly exploiting this trust and shamelessly capitalizing on the public's insatiable appetite for content about Mr. Combs in the lead up to his criminal trial, Defendants made a conscious decision to line their own pockets at the expense of truth, decency, and basic standards of professional journalism.  In January 2025, racing to outdo the competition for the most salacious Diddy exposé, Defendants maliciously and recklessly broadcast an outrageous set of fresh lies and conspiracy theories in a purported documentary they called "Diddy: The Making of a Bad

Boy" (the "Documentary").[1]  In the Documentary, Defendants accuse Mr. Combs of horrible crimes and misconduct, including serial murder, sexual assault and trafficking of minors, and extortion – knowing that there is not a shred of evidence to support them.

2.      As one independent critic observed after the Documentary aired: "It's remarkable that film-makers were able to get this thing past the corporate counsel at NBCUniversal."

3.      For example, the Documentary maliciously accuses Mr. Combs of murdering the love of his life and mother to his children, Kimberly Porter, despite the fact that the Los Angeles County Coroner's Office has confirmed that her death was from natural causes and that there has never been any evidence of foul play.  The Documentary advances the false narrative that it cannot be a "coincidence" that Ms. Porter and others in Mr. Combs's orbit have died, in a malicious attempt to insinuate that Mr. Combs murdered them.  In support, the Documentary features YouTube channel clips from a known conspiracy theorist, strung together with anonymized YouTube comments speculating about this purported "coincidence."  By maliciously advancing the unhinged narrative that Mr. Combs is a serial killer – with absolutely no evidence or logic to stand on and in the face of clear evidence to the contrary – Defendants spread fake news of the most damaging kind.

4.      The Documentary also accuses Mr. Combs of having sex with and sex trafficking minors, based entirely on a false claim by an anonymous interviewee that he saw two girls follow Mr. Combs into a room and his groundless speculation that, "for sure they were underage."  Defendants were grossly irresponsible in publishing this unsupported accusation because they possessed no reliable evidence that Mr. Combs had sex with underage girls and

---

[1] The complete Documentary is annexed to the Amended Complaint as Exhibit 1. Due to the media format, Plaintiff will provide an electronic copy of this exhibit to the Court and to counsel for the Defendants on removable media.

2

INDEX NO. 151935/2025
NYSCEF DOC. NO. 56    Case 1:25-cv-00650-JPC    Document 106-2    Filed 04/24/26    Page 3 of 32    RECEIVED NYSCEF: 09/12/2025

relied exclusively on an anonymous source. Indeed, allegations of such conduct made in a baseless lawsuit seeking $30 million had already been discredited by the *adult women in their 30s* referenced in that lawsuit who had come forward to say that they were adults at the time.

5. Defendants utterly disregarded professional standards of information gathering in creating and publishing the Documentary. The false and defamatory statements they disseminated are inherently improbable, while the truth – which Defendants ignored and failed to report – was easily accessible. Reasons abounded to doubt the accuracy of the sources in the Documentary. Defendants actually knew the information's falsity or, at a minimum, made no effort to verify the information they published (even in the face of sources that were inherently not credible and whose self-interested motivations for lying were evident) and published it anyways.

6. In making and broadcasting these falsehoods, among others, Defendants seek to capitalize on the public's appetite for scandal without any regard for the truth.

## THE PARTIES

7. Plaintiff Sean Combs is an individual who resides in Brooklyn, New York.

8. Defendant NBCUniversal Media, LLC is a global media and entertainment company in the television and film production industry. It is a subsidiary of Comcast Corporation and headquartered in Manhattan. NBCUniversal Media, LLC owns and operates PEACOCK TV LLC, through which NBCUniversal Media, LLC was responsible for broadcasting the Documentary.

9. Defendant PEACOCK TV LLC is a streaming service subsidiary of NBCUniversal Media, LLC and headquartered in Manhattan. Peacock is the streaming platform on which the Documentary aired.

3

3 of 32

Case 1:25-cv-00650-JPC   Document 106-2   Filed 04/24/26   Page 4 of 32

10.     AMPLE, LLC d/b/a Ample Entertainment is a production company based in Culver City, California that transacts business within New York and contracts to supply goods and services in New York, including the business of making and broadcasting the Documentary and the services provided in connection therewith.  Ample is the production company that was responsible for producing the Documentary.

## JURISDICTION AND VENUE

11.     This Court has personal and subject matter jurisdiction over this action pursuant to CPLR §§ 301 and 302(a)(1).

12.     Defendants NBCUniversal Media, LLC and PEACOCK TV LLC are headquartered in New York and all of the Defendants transact business within New York and contract to supply goods and services in New York, including because, as set forth herein, each Defendant participated in the business of making and broadcasting the Documentary and the services provided in connection therewith.

13.     Upon information and belief, the Documentary was broadcasted, streamed, and produced from, in, and to New York and filmed, or substantially filmed, in New York.

14.     Defendant NBCUniversal Media, LLC was responsible for broadcasting the Documentary, which, upon information and belief, was broadcasted, streamed, and produced from, in, and to New York and filmed, or substantially filmed, in New York.

15.     Defendant PEACOCK TV LLC is responsible for distributing the Documentary through its the streaming platform which, upon information and belief, was broadcasted, streamed, and produced from, in, and to New York and filmed, or substantially filmed, in New York.

4

16.     Defendant AMPLE, LLC d/b/a Ample Entertainment was responsible for producing the Documentary which, upon information and belief, was broadcasted, streamed, and produced from, in, and to New York and filmed, or substantially filmed, in New York.

17.     Venue is proper in New York County pursuant to CPLR § 503(a) because Defendants NBCUniversal Media, LLC and PEACOCK TV LLC are headquartered in Manhattan.

## FACTUAL BACKGROUND

18.     Mr. Combs became famous for his extraordinary and historic achievements as a musician and music producer, hip hop impresario, record label owner, fashion designer, pathbreaking spirits entrepreneur, committed philanthropist, and cultural icon.  Mr. Combs is among the most accomplished businessmen of his generation.

19.     In September 2024, Mr. Combs was indicted in the Southern District of New York on federal racketeering and sex trafficking charges.  Mr. Combs entered a plea of not guilty to those charges on September 17, 2024, emphatically and unequivocally denying that he was guilty of sex trafficking or racketeering.  Following an eight-week trial in the Southern District of New York, on July 2, 2025, a jury acquitted Mr. Combs of the most serious charges levelled against him, finding him not guilty of sex trafficking and not guilty of racketeering.

20.     Neither the criminal indictment, the criminal trial, nor the verdict involved any allegations or findings of murder, sexual assault or trafficking of minors, or extortion.

21.     In or around December 10, 2024, Defendant Ample informed Mr. Combs's representatives that it was producing a documentary – not about the Government's allegations against him, but rather regarding allegations completely distinct from those made in the criminal

case against Mr. Combs, including theories of his involvement in the deaths of Kim Porter and Christopher Wallace, and allegations of sex with underage girls.

22.     In response, Mr. Combs's representatives told Defendant Ample that those allegations were unequivocally false and lacked any credible evidence.

23.     Despite receiving this information, on January 2, 2025, Defendants Ample and NBCU released a trailer for the Documentary (the "Trailer").  The Trailer portrays Mr. Combs as a dangerous "monster," who threw sinister parties with "underage" girls and threatened to "ship" and "sell" women off "to anyone."

24.     On January 8 and 9, 2025, representatives of Mr. Combs sent letters informing Defendants Ample and NBCU that the Trailer included false and defamatory statements, and urged them to take down the Trailer and refrain from publishing the Documentary.  Defendants Ample and NBCU did not respond.

25.     On or around January 13, 2025, Defendants Ample and NBCU released the Documentary to select press outlets to increase publicity prior to its release date.

26.     On January 14, 2025, NBCU made the Documentary publicly available for viewing on the Peacock streaming platform.  Defendants also widely publicized the Documentary to get as many streams as possible.  In one interview with *The Hollywood Reporter*, co-founder of Defendant Ample and an executive producer of the Documentary, Ari Mark, acknowledged that, in an effort to release content about Mr. Combs ahead of competing documentaries about Mr. Combs, Defendants rushed to create and publish the Documentary in a far less time than is customary.  In their reckless race to the front, Defendants failed to follow industry standard practices for investigative journalism that take time to accomplish like verifying sources and exposing source biases and ulterior motives.  Acknowledging that

6

Case 1:25-cv-00650-JPC    Document 106-2    Filed 04/24/26    Page 7 of 32

Defendants did not spend the amount of time ordinarily spent by journalists on such investigative projects, Mark stated, "There's no time and this was an extremely fast turnaround."

27.     In addition to cutting corners in their race to publish ahead of competition, Defendants also tried to beat the competition by publishing allegations different from those made in public proceedings.  As Mark stated, "[i]t's really competitive and I think that is why it wasn't enough to be fast, it was also necessary to be distinct."  In order to create something "distinct," Defendants went beyond what was being alleged and reported in judicial proceedings.  Reporting on such proceedings would not have served Defendants' goal of distinguishing themselves in the crowded media market.  Mark explained that the "only reason to do [the Documentary]" is to include "shocking" stories that had not been told before.

28.     As Mark further explained, Defendants "were doing it in a way that felt there was a new point of view to be offered up."

29.     The pressure to quickly create and publish the Documentary, together with the pressure to be "distinct" in the market, led Defendants to completely disregard sound journalistic practices and ethics.  In the quest to make a splash in the market, stand out to viewers, and make more money, Defendants Ample and NBCU published a Documentary that includes numerous false and defamatory statements that Defendants knew were false or published with reckless disregard as to whether they were false or not.  Indeed, the entire premise of the Documentary is to persuade viewers that Mr. Combs has committed numerous heinous crimes, including serial murder, rape of minors, and sex trafficking of minors.  It maliciously and baselessly jumps to the conclusion that Mr. Combs is a "monster" and "an embodiment of Lucifer" with "a lot of similarities" to Jeffrey Epstein.  In doing so, the Documentary advances the following profoundly injurious false accusations.

Case 1:25-cv-00650-JPC    Document 106-2    Filed 04/24/26    Page 8 of 32

*False Statements That Mr. Combs Is A Serial Murderer*

30.     The Documentary falsely, recklessly, and maliciously accuses Mr. Combs of murdering Kimberly Porter, Christopher Wallace ("Biggie"), Andre Harrell, and Dwight Arrington Myers ("Heavy D"), and of attempting to murder Albert Joseph Brown aka "Al B. Sure." It shamelessly advances and endorses conspiracy theories that lack any foundation in reality, repeatedly stating that Mr. Combs is a serial killer.

31.     Ms. Porter was Mr. Combs's romantic partner for over a decade and the mother to four of his children. She was, as he often described her publicly, the love of his life. In 2018, Ms. Porter tragically died after a battle with complications from pneumonia. The Los Angeles Coroner's Office confirmed that her death was a result of natural causes.

32.     Christopher Wallace, an American rapper and close friend of Mr. Combs, was killed in a drive-by shooting in 1997. There has never been a hint of evidence to suggest that Mr. Combs was involved in the tragic murder of his friend.

33.     Andre Harrell was a prominent music executive who died of heart failure in 2020. There has never been a hint of evidence to suggest that he was murdered, let alone that Mr. Combs was responsible for his death.

34.     Dwight Arrington Myers was an American rapper and producer who died of a pulmonary embolism in 2011. There has never been a hint of evidence to suggest that he was murdered, let alone that Mr. Combs was responsible for his death.

35.     Mr. Combs had longstanding, deep, personal relationships with Ms. Porter, Mr. Wallace, Mr. Harrell, and Mr. Myers. He was heartbroken by their untimely deaths and the completely unfounded accusation that he *murdered* multiple of his closest confidantes is deeply distressing, offensive, reckless, and malicious.

8

INDEX NO. 151935/2025

Case 1:25-cv-00650-JPC    Document 106-2    Filed 04/24/26    Page 9 of 32

RECEIVED NYSCEF: 09/12/2025

36.     And yet, despite all evidence to the contrary, Defendants falsely accused Mr. Combs of being a serial killer – killing Ms. Porter, Biggie, Mr. Harrell, Heavy D, and attempting to kill Sure.

37.     The Documentary includes an interview with Al B. Sure, who conclusively asserts that Ms. Porter was "murder[ed]." Trailing this statement, he facetiously adds "do I have to say allegedly?" He further falsely claims that, before her death, Ms. Porter was keeping a diary and was planning to "reveal all," but that "someone" – by which he meant, the subject of the Documentary, Mr. Combs – "found out that she was writing what was going on behind closed doors." Al B. Sure asserts that "a lot goes on in the industry" and that "those who speak about it usually meet their demise." He further falsely claims that Ms. Porter is "gone because she was going to be the next Cassie Ventura," by which he meant she was about to "blow[] the lid off of this entire situation."

38.     In sum, Defendants falsely stated that Mr. Combs killed Ms. Porter because she was about to reveal negative information about Mr. Combs.

39.     In making such statements, Defendants convey to the audience that Sure *knew*, but did not share with the Documentary viewers, what Ms. Porter was purportedly about to reveal.

40.     Sure also falsely claims that he is a witness in connection with "legal proceedings" surrounding Ms. Porter's death, preventing him from elaborating in the interview. The Documentary does not share with the audience what Sure knew that he purportedly could not elaborate on due to purported "legal proceedings" surrounding Ms. Porter's death.

Case 1:25-cv-00650-JPC   Document 106-2   Filed 04/24/26   Page 10 of 32

41.     In other words, by publishing Sure's defamatory statements, Defendants conveyed to the Documentary's viewers that Sure knew something the public did not that supported his accusation that Mr. Combs killed Ms. Porter.

42.     Indeed, the contention that Sure's conclusions are based on facts in Sure's possession but unavailable to the public is explicit.  In the Documentary, Sure tells the audience "*if you only knew* the shit I've fucking been through . . . .  It's a lot worse than what the public knows."

43.     Viewers are left with the false impression that the interviewee knows certain undisclosed facts that are detrimental to Mr. Combs and that support Sure's accusation that Mr. Combs is a murderer.  And by suggesting that law enforcement is investigating Ms. Porter's death and that Al B. Sure is a witness, Defendants maliciously credit the false claim that Mr. Combs is being investigated for Ms. Porter's death.

44.     Defendants further advanced the false narrative that Mr. Combs killed Ms. Porter by prominently featuring an attorney, Ariel Mitchell, who is portrayed as having inside information about Mr. Combs and who rhetorically asks, "who is dying from pneumonia? Seriously, pneumonia? And to die so quickly?"  Mitchell ridicules the idea that Ms. Porter died of natural causes, saying, "people get pneumonia every day and don't die.  That doesn't seem like a natural cause."

45.     In truth, there is no investigation into Ms. Porter's death, which the Los Angeles Coroner's Office has concluded was caused by lobar pneumonia.  Rather than present this verifiable fact as credible evidence debunking Sure and Mitchell's unsubstantiated conspiracy theories, Defendants falsely portray the coroner's findings as if they are part of a sinister coverup.

10

Case 1:25-cv-00650-JPC    Document 106-2    Filed 04/24/26    Page 11 of 32

46.     Whereas the Documentary endorses the false narrative that Mr. Combs killed Ms. Porter by prominently featuring multiple well-dressed interviewees in carefully framed settings confidently confirming this tale of murder as if they had special knowledge, it fails to include a single interview with anyone describing the actual conclusions of those who investigated (and confirmed no foul play in) Ms. Porter's tragic death.

47.     Instead of presenting that (true) counternarrative through the voices of those with actual knowledge or through documentary evidence, Defendants instead facetiously flash across the screen in plain white text that "medical professionals have not found any evidence to indicate that Kim Porter's death was the result of unnatural causes."  Like other boilerplate disclaimers sprinkled throughout the Documentary in plain white font against a stark black screen with ominous music in the background, the intent of the text is clear: it is presented as a statement not to be credited, an example of how Mr. Combs purportedly committed murder and used his power and influence to cover it up.

48.      Sure's statements that law enforcement is investigating Mr. Combs's involvement in Ms. Porter's death are false and defamatory.  As set forth herein, Defendants knew those statements were false or published them in reckless disregard of their falsity.

49.     In the Documentary, Al B. Sure also falsely claims that his own health problems were the result of an attempted murder perpetrated by Mr. Combs.  He claims that Ms. Porter warned him "don't get involved, you will get killed," that she was putting her "life in danger" trying to save him, and that there were people – by which he means the subject of the Documentary, Mr. Combs, and those acting at Mr. Combs's direction  – involved "in the attempted murder of Al B. Sure" (referring to himself in the third person).  The Documentary maliciously advances this narrative notwithstanding the fact that Al B. Sure's medical problems

11

Case 1:25-cv-00650-JPC    Document 106-2    Filed 04/24/26    Page 12 of 32

were consistent with complications associated with his bariatric surgery and that there is no support whatsoever for his baseless claims.

50.    Rather than present viewers with credible professionals or scientific evidence that would confirm Sure's symptoms were natural conditions, not byproducts of foul play, Defendants deliberately minimized the truth: once again, in plain white text against a stark black screen they flash a  half-hearted disclaimer that: "some of [Sure's] symptoms . . . have been known to be potential side effects of [bariatric] surgery."  Again, the intent of this ostensible disclaimer is clear: Defendants intended to communicate to viewers that Mr. Combs murdered Ms. Porter and attempted to murder Al B. Sure, and that the fact that "some" of Sure's "symptoms" were consistent with complications from his surgery is too coincidental to be true and is instead part of an elaborate, yet undisclosed, cover up perpetrated by Mr. Combs to hide his murderous aims.

51.    Again, the audience is left with the false implication that if only Sure told them the undisclosed information he is withholding due to purported "legal proceedings" and if only the audience "*knew* the shit I've fucking been through," they would have proof Mr. Combs attempted to murder Sure.

52.    Sure's statements that Mr. Combs attempted to murder him are false and defamatory.  As set forth herein, Defendants knew those statements were false or, at a minimum, published them in reckless disregard of the truth.

53.    At the time they published the Documentary, Defendants knew that Ms. Porter died of natural causes and that there was no support for Al B. Sure's claim that she was murdered (because the coroner had confirmed she died of natural causes) or for his claim that Mr. Combs had attempted to murder Sure (because his injuries were shown to be complications

12

Case 1:25-cv-00650-JPC   Document 106-2   Filed 04/24/26   Page 13 of 32

from surgery). Defendants also knew that Al B. Sure – Ms. Porter's ex, before she started dating Mr. Combs – was an unreliable source as numerous public reports reflected Sure had long held a jealous grudge against Mr. Combs arising from Mr. Combs's longstanding relationship with Sure's ex-girlfriend, Ms. Porter, and from the paternal relationship that had developed between Mr. Combs and Quincy Brown, Sure's biological child with Ms. Porter. Indeed, Defendant Ample's co-founder and an executive producer of the Documentary, Ari Mark acknowledged in an interview with *The Hollywood Reporter*, that Sure had a "weird, very kind of complicated relationship with Sean Combs."

54. Yet, despite Sure's self-interested motivation to fabricate damaging falsehoods about Mr. Combs, Mark wanted to include Sure's statements in the Documentary "because we think it will be a better film as a result."

55. Thus, notwithstanding their knowledge that Sure was an unreliable narrator when it came to Mr. Combs, Defendants encouraged Sure to share "whatever [he was] comfortable sharing" about Mr. Combs and the purported "saga" as Mark conceded.

56. Defendants broadcasted and endorsed Sure's accusations that Mr. Combs had tried to kill him even though in a radio interview posted on November 20, 2023, Sure and his doctor had publicly contradicted Sure's claim that Mr. Combs attempted to murder him. In that radio interview, Sure's doctor confirmed that Sure's injuries were caused by underlying liver disease and Sure explained that his liver failure was caused by his unhealthy diet and lifestyle, which were common problems in the entertainment industry. Speaking about the cause of his injuries, Sure stated "It's in the food and sometimes it's also in the shenanigans in the industry . . . you know where I started – hip hop." Sure's statements during this interview evidence that he knew Mr. Combs had nothing to do with his health problems. Defendants did not include or

13

reference in the Documentary the fact that Sure and his doctor had previously made statements contradicting Sure's accusations of attempted murder.

57.    Sure's previous public statements demonstrated to Defendants that he is an inherently unreliable, disturbed, inconsistent, conspiracy theorist with a "weird" relationship with Mr. Combs.  Despite Defendants' professional duty to investigate whether these red flags resulted in Sure lying in his interview to falsely malign Mr. Combs, Defendants disregarded this duty, and published Sure's deeply harmful accusations as if they were credible.  Indeed, Mark admitted that his aim was to "t[ake] off the pressure," "just have a conversation," and "see where this goes."  In other words, Defendants published in the Documentary anything Sure said about Mr. Combs, without adhering to even the most basic journalistic standards and in reckless disregard of whether or not there was any truth in Sure's statements.

58.    Similarly, the Documentary advances an unhinged conspiracy theory that Mr. Combs is responsible for the deaths of Andre Harrell and Dwight Arrington Myers ("Heavy D"), in addition to Kim Porter, speculating that it would be too much of a "coincidence" that Harrell, Heavy D, and Kim Porter all died of natural causes.  In an effort to tie these disparate events together, the Documentary falsely asserts that all three were poised to go public with some unspecified inside information (not shared with the viewer).  The Documentary then falsely conveys that these individuals were killed as a result, by Mr. Combs.  For example, Al B. Sure falsely states: "This person was telling a story.  This person was writing a book.  This person's about to tell the truth.  Why is everybody dead?  Oh, it's a coincidence?  Get the fuck out of here."  The Documentary thus implies that Sure knows but does not share with the viewer what "truth" the deceased were purportedly about to disclose.

14

Case 1:25-cv-00650-JPC    Document 106-2    Filed 04/24/26    Page 15 of 32

59.    To further advance this false narrative, the Documentary includes a clip from a YouTube interview with Jacquelyn Suzette "Jaguar" Wright, a conspiracy theorist who skeptically points out that, of the "five people" who, she says, started Uptown Records, "the only two people left are Puffy and Al [B. Sure], and Al almost died." She insinuates that both Harrell and Heavy D were killed by Mr. Combs and did not actually die of heart attacks, stating with obvious skepticism: "Heavy D was found dead – heart attack.  Andre Harrell – heart attack."

60.    Jaguar Wright is presented in the Documentary as a "singer & songwriter," giving viewers the impression that she has credible inside information about Mr. Combs.  In truth, Wright is a conspiracy theorist with no personal connection to Mr. Combs who traffics in unverified celebrity gossip and has been known to engage in "erratic behavior" and tell "inconsistent" stories.

61.    Media reports have speculated that Wright's "mental health struggles" impair her ability to tell the truth and that she has fabricated salacious allegations against others on numerous occasions.

62.     For example, Wright was reportedly arrested in June 2024 for stealing a U-Haul truck.  After the arrest, she asserted that YouTuber "Tasha K" was somehow responsible for her arrest and that the arrest was an attempt to "silence" her.  Tasha K confirmed she had "nothing to do with [Wright] not returning that U-Haul" and explained that Wright's stories are often inconsistent and indicative of her mental health struggles.  As an example, Tasha K described an instance in which Wright falsely claimed she had been the target of a (wholly improbable) high-speed car chase from Dallas to Las Vegas.

63.    Wright's accusations against Mr. Combs in particular had been publicly discredited before Defendants brazenly gave Wright a platform to amplify them.  Following

15

Wright's June 2024 arrest, Tasha K ridiculed the idea that "[p]eople are believing the Diddy stuff" Wright published. "Jag [Wright] watches a lot of the blogs, and regurgitates it, and makes it entertaining. But when I slow down that part, I said, but this is who y'all are believing." Tasha K went on to note that Wright's relatives had confirmed "that lady ain't wrapped too tight."

64. None of these concerning allegations about Wright's credibility were disclosed in the Documentary.

65. Rather than present Wright as an unhinged conspiracy theorist who has no basis for her claims and has a history of fabrications, the Documentary endorses Wright's allegations that Mr. Combs is responsible for the death of Harrell and Heavy D and falsely conveys to viewers that those allegations are credible, bizarrely including what appear to be internet comments to Jaguar Wright's YouTube interview on this topic, following Wright's allegations. That commentary states: "Jag be connecting them dots. Fact or coincidence you gotta admit it's really interesting 🫢." Others say "Damn she really pieced that together I never looked at it that way!!" and "Jaguar Wright is NOT lying! Chile… Puffy can't be surrounded by this many coincidences." The Documentary adds another that says: "It is no coincidence that all the original employees, except for Al B, are dead. Mind you after Al B spoke out against Diddy after Kim Porters death he was in a coma for several months. The common denominator is Diddy!!!!" By including these comments, with dramatic effect, the Documentary suggests that the lack of evidence regarding Mr. Combs' involvement with the deaths of Harrell and Heavy D is the result of some sort of elaborate cover up and that, if the viewer "connect[ed] the[] dots," like Wright did, the viewer should believe Wright and disbelieve the actual facts.

16

66. The statements by Sure and Wright that Mr. Combs was responsible for the deaths of Ms. Porter, Mr. Harrell, Mr. Myers, and the attempted murder of Sure, are false and defamatory. As set forth herein, Defendants Ample and NBCU knew those statements were false or published them in reckless disregard for the truth.

67. The Documentary also advances the baseless conspiracy theory that Mr. Combs was involved in the death of Christopher Wallace ("Biggie"). It features an interview with Gene Deal, a former bodyguard who is described as having worked for Mr. Combs between 1991 and 2005. Deal claimed that, in the "week in which Big was murdered, [Mr. Combs] was acting real anxious trying to get Big at this party." He further claimed that, when Mr. Combs suggested going to a party that evening, Mr. Deal warned him, "if we go to this party tonight, we gonna get killed, somebody gonna die," but that Mr. Combs "said I don't want to hear that shit."

68. The producer can be heard egging Deal on, asking "do you think that he had any involvement in Big's death?" Deal began his answer by saying that Combs merely "placed [Wallace] in an atmosphere," but then, signaling that his original answer was not the whole truth, he asked himself, "did he directly have something to do with it?" Deal then paused, looked up and contemplated his answer, appearing to recall certain facts that he did not share with the viewer. He then changed the direction of his answer. In response to his own question: "Did he directly have something to do with it?" Deal answered: He could have."

69. The Documentary thus leaves the audience with the false impression that Deal knows certain facts, detrimental to Mr. Combs and unknown to the audience, that support his conclusion that Mr. Combs is a murderer.

70. Defendants had obvious reason to doubt Deal's statements. There has never been any evidence that Mr. Combs was involved in Biggie's death. The facts and circumstances

17

surrounding Biggie's murder were widely reported and subject to intense public scrutiny. The truth – that Mr. Combs had no involvement in Biggie's murder – has been widely known and easily accessible for decades.

71. Furthermore, Deal had previously made public statements about Biggie's death that directly contradict his accusation that Mr. Combs had been directly involved in Biggie's murder. A February 16, 2023 Business Insider article recounted numerous prior statements that Deal made to media outlets and to the FBI in records that had since been made public. The article recounted an August 2021 interview that Deal gave to "VladTV" where Deal stated that, before Biggie's murder, he told Mr. Combs that he received "intel" that "guys are coming to kill us tonight at the museum party." The article also reported on an FBI investigation file obtained by "The Sub" in 2018, where Deal also claimed that Mr. Combs was the target of the shooting that night that resulted in Biggie's murder. According to the Sun, "Deal strongly believes Biggie was not the intended target, but that Combs was."

72. As Defendants must have known, Deal holds significant ill-will towards Mr. Combs and has obvious motivation to lie about him. Anyone with access to the internet would know that Deal believed he had been undercompensated and undervalued by Mr. Combs. Deal had claimed that Mr. Combs was "greedy" and tried to cut back on Deal's working hours in order to pay him less.

73. Since at least 2019, Deal has publicly expressed animosity towards Mr. Combs for asking him to do certain tasks for Mr. Combs's mother that Deal felt were beneath him. According to multiple online posts made by Deal, the tensions between Deal and Mr. Combs arising from Deal's refusal to help Mr. Combs's mother ultimately led to the termination of Deal's employment with Mr. Combs.

18

Case 1:25-cv-00650-JPC    Document 106-2    Filed 04/24/26    Page 19 of 32

74. Driven by his resentment towards Mr. Combs, Deal had thus made a career out of stirring up drama about Mr. Combs online and monetizing that drama. Deal has participated in and, in many instances, self-published, countless videos online evidencing a pattern of unhinged animosity towards Mr. Combs.

75. Given Deal's obvious motivation to lie about Mr. Combs, Defendants had a duty to investigate his claims. However, rather than taking the time to investigate and vet Deal's claims before airing them in the Documentary, Defendants ignored this duty and published the false accusation that Mr. Combs was directly involved in Biggie's murder.

76. Defendants included in the Documentary an interview with Deal – an aggrieved former employee – who stated, contrary to public statements he made in the past, that Mr. Combs may have been "directly" involved in Biggie's murder. Despite their professional duty to investigate and verify Deal's statements consistent with industry standards in performing due diligence, Defendants failed to conduct industry standard due diligence and included the false statements in the Documentary, without any regard to sound journalistic practices or the veracity of Deal's statements.

77. There has never been any evidence that Mr. Combs was involved in Biggie's death. The statements alleging that Mr. Combs was involved in Biggie's death are false and defamatory. Defendants Ample and NBCU knew they were false or published them in reckless disregard for the truth. By providing Deal with a platform for insinuating that Mr. Combs was responsible for the murder, Defendants acted with malice and total disregard for the truth.

***False Accusations About Sex With Minors***

78. The Documentary also falsely and maliciously asserts that Mr. Combs was having sex with, and was sex trafficking, underage girls. In particular, the Documentary features an

19

INDEX NO. 151935/2025
RECEIVED NYSCEF: 09/12/2025

Case 1:25-cv-00650-JPC    Document 106-2    Filed 04/24/26    Page 20 of 32

interview with an anonymized subject who appears with his image blacked out and his voice distorted.

79.    In the Documentary, this unidentified interviewee claimed that, while he was employed by Mr. Combs, he was sent on "missions" to go to clubs to "recruit some girls" and "bring them back to the house," but that he didn't know what the "real intention was," falsely implying the "real intention" was to sexually assault and/or traffic minors.

80.    The same anonymized interviewee further falsely claimed that Mr. Combs was "fucking and making love and sex" to girls who "[f]or sure they were underage."

81.    The Documentary then cuts to portion of an unidentified legal document that states: "Present at this party w- . . . underaged girls."

82.    The Documentary falsely implies that this document is corroboration of the unidentified interviewee's allegation that Mr. Combs had sex with underage girls.  In fact, it is a copy of a civil complaint brought by Rodney Jones against Mr. Combs containing the same false allegations as made by the anonymized interview subject and seeking $30 million in purported damages.  The Documentary does not include, however, the fact that allegations about minors have been thoroughly discredited.  After Jones filed his lawsuit – which identified the allegedly underage females – those adult women *in their 30s* came forward to say that they were not underage at the time and that they never witnessed anything untoward happen at the parties, including the red-lit house party featured in the Documentary.

83.    Defendants published an interview with an anonymous interviewee who made false and defamatory statements that Mr. Combs had sex with underage girls even though they had no independent evidence to support that assertion and even though, by conducting even the

20

Case 1:25-cv-00650-JPC    Document 106-2    Filed 04/24/26    Page 21 of 32

most basic diligence consistent with industry standards for responsible journalism, Defendants would have known that such allegations had been discredited.

***False Accusations That Secretly Recorded Sex Tapes Were Used to Extort Intimate Partners***

84.    In the Documentary, Defendants also maliciously endorse the false and defamatory claim by an attorney, Ariel Mitchell, that her client, Courtney Burgess, possesses "flash drives of sex tapes" with celebrities that Mr. Combs secretly recorded and used for extortion.

85.    Courtney Burgess has been described as "a one-time industry bit player" and "a fringe character." In recent months, seeking to capitalize on the media's insatiable appetite for celebrity scandal, Burgess has gone to great lengths to invent and publicize outrageous falsehoods about Mr. Combs. In media interviews, Burgess claims he has worked in the music industry for decades, but he has no public record of any professional achievements and he left no detectable footprint on the industry prior to his recent campaign to malign Mr. Combs. His malicious conduct, which according to the New York Times "has only amped up the circuslike frenzy surrounding [Mr. Combs's] case," is intended to garner publicity to profit from the attention surrounding Mr. Combs's legal proceedings.

86.    For example, Burgess has claimed on multiple occasions that Kimberly Porter provided him with a copy of her memoir and videos Mr. Combs recorded that depict Mr. Combs sexually assaulting inebriated celebrities and minors. Those close to Ms. Porter, including her children and her roommate for over 20 years, had never heard of Mr. Burgess before he made this utterly implausible and completely false claim.

87.    Notwithstanding the fact that Burgess's claims concerning purported sex tapes involving Plaintiff were patently fabricated, in the Documentary, Mitchell falsely stated that

21

Burgess was in possession of video tapes of Mr. Combs having sex with celebrities that Mr. Combs had secretly recorded without the consent of those partners and then used to extort the individuals depicted in the videos.

88.    Despite Burgess's inconsistent and implausible accounts about purported sex tapes, Defendants gave his attorney, Ariel Mitchell, a platform to promote lies borne from Burgess's false accounts.  The Documentary includes Mitchell's false accusations that Mr. Combs used these purported recordings "to advance his influence and his power," and threaten to "take this to your wife," "take this to your husband," "take this to the public," "and I'll ruin you if you don't do this for me."

89.    Defendants knew or recklessly disregarded that Burgess did not possess such videos and that Mr. Combs had never used any such videos to extort anyone because Defendants did not view any such videos themselves, nor did they obtain any evidence of their existence or of any purported extortion (as no such evidence exists).

90.    Moreover, Defendants knew that Mitchell was a wholly unreliable character.  As would have been reflected in a simple Google search, Mitchell had previously made ridiculous claims that "research" indicated that baby oil can be used as a "conduit" for transmitting drugs "mixed into the oil" to another person for the purpose of incapacitating them.  Mitchell was previously accused of bribing a witness to change her testimony to corroborate claims filed by Mitchell.  And Mitchell has a history of filing frivolous claims and then withdrawing from the lawsuit when the lies come to light.

91.    For example, in connection with one such representation, in or around 2021, Mitchell brought a lawsuit against Mr. Combs and the celebrity musician Trey Songz on behalf of a woman claiming sexual assault by Trey Songz.  Mr. Combs was dismissed as a defendant

22

Case 1:25-cv-00650-JPC    Document 106-2    Filed 04/24/26    Page 23 of 32

from that lawsuit in its early stages. In 2022, a witness in that lawsuit testified that Mitchell tried to bribe her to lie about witnessing the purported assault and being assaulted herself. In connection with those allegations of professional misconduct, three complaints were filed with the Florida Bar accusing Mitchell of engaging in witness tampering.

92.    Thereafter, the Florida Bar filed a complaint against Mitchell arising out of the complaints that she had attempted to bribe a witness to corroborate allegations of sexual assault against a celebrity. The Florida Bar concluded that Mitchell had violated multiple rules of professional conduct, including with respect to "Truthfulness in Statements to Others" and "Dishonesty, Fraud, Deceit, or Misrepresentation."

93.    As described by the Florida Bar, the witness in question had signed a sworn declaration describing how Mitchell claimed to have "contacted several paparazzi and news media outlets" about her client's claim and told the witness those media organizations would pay her for her "story." In its complaint against Mitchell, the Florida Bar alleged Mitchell had repeatedly misrepresented to the media the status of the complaints against her, falsely telling multiple news outlets in February 2022 that the Florida Bar had taken "no action" in connection with the witness tampering complaints when, in fact, the Florida Bar's investigation into Mitchell's witness tampering was still open.

94.    The Florida Bar also alleged Mitchell had violated ethics rules concerning truthfulness and deceit in her defense against a sanctions motion filed by Songz. In particular, the Florida Bar's investigation showed that, in an attempt to discredit the witness who swore she had been offered a bribe, Mitchell falsely asserted the witness had "drank heavily" during their meeting and that Mitchell had not been drinking at all. Contrary to Mitchell's representation to the court, a receipt from the establishment where that meeting occurred showed that the witness

23

had only had one drink, and that Mitchell had also had a drink. The Florida bar found "[t]his receipt conclusively demonstrated that [Mitchell] made an affirmative misrepresentation in her attempt to impeach [the] witness."

95. For her repeated lack of candor to the media and to at least one court, the Florida Bar has requested that Mitchell be disciplined. Other allegations brought by Mitchell against celebrities have similarly been publicly discredited. In or around 2022, Mitchell brought a $20 million lawsuit against the rapper Chris Brown on behalf of a woman claiming Brown raped her. After Brown posted a series of text messages and voicemails reflecting a consensual relationship with the plaintiff, Mitchell withdrew.

96. In truth, Burgess does not, and never did, possess the videos Mitchell claimed he possessed and Mr. Combs never used such videos to extort anyone. Mitchell and Burgess are the sources of these vile rumors, and Defendants are responsible for maliciously perpetuating them in reckless disregard of their falsity.

97. The statements in the Documentary that Mr. Combs secretly recorded sex tapes and used them as tools for extortion are false and defamatory. Defendants knew these statements were false or published them in reckless disregard for the truth.

***The Documentary Endorses the False and Defamatory Statements as Facts the Viewer Should Believe Despite Clear Evidence That Demonstrate the Falsity of the Defamatory Statements***

98. The Documentary published the above falsehoods, endorsing them as credible truths from "people . . . speaking out about [Mr. Comb's] past." The Documentary promised viewers that it will provide "insight on who [Mr. Combs] was."

99. The documentary uses ominous music, editing, and innuendo to endorse and bolster the false and defamatory statements of the interviewees, while casting doubt on Mr. Combs' denials and facts that contradict the interviewees' statements. In doing so, the

24

Documentary presents the false and defamatory statements set forth above as *facts* the viewer should believe, while presenting the actual facts (to the extent they are presented at all) as false and part of some undisclosed cover up orchestrated by Mr. Combs and others.  Rather than neutrally reporting relevant facts, the Documentary endorses obviously false and defamatory conspiracy theories put forward by unreliable sources.  In doing so and in failing to conduct even the most basic due diligence, Defendants grossly strayed from industry standards for professional journalism.

100.    Defendants presented the Documentary to viewers as an investigative report providing "insights" into Mr. Combs from credible sources with special, inside knowledge.  In reality, the Documentary was nothing more than a widely distributed forum for Defendants to peddle harmful lies about Mr. Combs for their own profit.

101.    For example, Sure stated that Ms. Porter told him "you will get killed." Accompanying this statement is a dramatic musical build up followed by a quick cut to black screen for dramatic effect.  This editing technique had the effect of emphasizing and endorsing Sure's statements.  The Documentary then cuts to a statement by Deal stating that he saw bruises on Ms. Porter.  When viewing this sequence in its totality, it is clear that the Documentary is communicating to viewers that Mr. Combs murdered Ms. Porter and attempted to murder Sure.

102.    In juxtaposition to the dramatic emphasis placed on Sure and Deal's statements, the Documentary then cuts to a plain text screen title stating that "there was no evidence that Kim Porter was the victim of domestic violence."  Viewing this statement in the full context of the Documentary, a reasonable viewer would infer that this plain text should be disbelieved.  The unadorned visual and audial effects accompanying the statement, as compared to those accompanying the defamatory statements presented by Sure and Deal, signify to the reasonable

25

Case 1:25-cv-00650-JPC    Document 106-2    Filed 04/24/26    Page 26 of 32

viewer that Sure and Deal should be believed while statements to the contrary should be disregarded as part of the efforts to cover up Mr. Combs's purported misconduct.

103.    As an apparent attempt to bolster and endorse Sure and Deal's false statements, the Documentary next includes a dramatic interview of an anonymous interviewee with his voice altered to "protect his life" because Mr. Combs "allegedly . . . had people hurt."  The Documentary interposes text on the screen tracking the words of the anonymous interviewee.  As the anonymous interviewee's statement progresses, the words fade off the screen, except for one word: "hurt."  By presenting the statement in this way, the Documentary emphasizes that the viewer should believe that Mr. Combs has people hurt for speaking out against him and should therefore believe that he murdered Ms. Porter and attempted to murder Sure.

104.    Similarly, following an interview of a journalist stating that Combs "was known to commit acts of violence himself," "threaten people with violence," and "known to be very vindictive," the Documentary flashes to a clip showing Biggie and a reporter stating that there had been "rumors that [Mr. Combs] might have had something to do with Biggie's death." Immediately after that sequence, a dramatic musical buildup leads into Deal's interview where he alleges that Mr. Combs could have been "directly" involved in Biggie's murder.  As soon as the Documentary producer off screen eggs Deal on by asking whether he thinks Mr. Combs could have been involved in Biggie's death, the documentary pauses the interview and plays a powerful, startling dark pitched-down bass note, reminiscent of a sound typically found in horror films, behind a picture showing Biggie and Combs together.  Following this lead up, and with this audial context, Deal then says he thinks Mr. Combs could have been "directly" involved in Biggie's murder.  As soon as Deal says that, the music crescendos into a dramatic buildup and release.  Directly following this statement, the Documentary shows a black screen with basic text

26

Case 1:25-cv-00650-JPC    Document 106-2    Filed 04/24/26    Page 27 of 32

stating that Mr. Combs "has always denied having any involvement" in Biggie's murder. Against the backdrop of the plain text, the music moves from the dramatic buildup into a dark, pensive tone with inquisitive embellishments, before fading out along with the text. This music stands in stark contrast to the dramatic built up to Deal's false and defamatory statement. By presenting Deal's statements this way, the Documentary endorses Deal's statement and emphasizes that the viewer should believe Deal's statement and disbelieve Mr. Combs's denial.

105.    The Documentary is replete with similar manipulative techniques, all maliciously designed to present false and defamatory statements as truth, while presenting contrary facts and denials as not credible.

106.    Notwithstanding the few gratuitous plaint text disclaimers peppered throughout the Documentary, a reasonable viewer, viewing the Documentary in its entirety, would have understood Defendants to be communicating that Mr. Combs murdered Kimberly Porter, Christopher Wallace, Andre Harrell, and Dwight Arrington Myers, attempted to murder Albert Joseph Brown, had sex with and sex trafficked minors, and extorted sexual partners with secretly recorded sex tapes because that is precisely what the Defendants intended to convey by presenting these (false) narratives on an otherwise reputable platform and through people portrayed as having unique and credible insight. Ample's Ari Mark admitted this: "When you present it that way, . . . people listen and I think they recognize that we have a good track record and we're not making this up."

107.    Indeed, in an interview about the Documentary, Mark explained: "I hope audiences can . . . look at their faces, hear their voices and realize that in some ways this is a shared trauma." In other words, Mark explicitly acknowledged that the messages conveyed

27

through Sure, Wright, and Mitchell were intended to convey truth, whereas the statements published through plain text disclaimers were not.

***Defendants' Malicious Lies Have Materially Injured Mr. Combs***

108.    As set forth above, Defendants made false and defamatory statements about Mr. Combs knowing that they were false and with reckless disregard of their falsity.

109.    Defendants made these false and defamatory statements in bad faith, as part of a deliberate effort to damage Mr. Combs's reputation, undermine his businesses and, by painting him as a debauched murderer and pedophile, to poison the public's perception of him and deprive him of a fair trial. Defendants eagerly peddled these lies to enrich themselves, knowing that those claims were false or making no effort to verify the truth of those false claims.

110.    As a result of Defendants' malicious lies, Mr. Combs has suffered significant reputational and economic harm. Defendants' lies and conspiracy theories have reached millions. Moreover, many viewers published and republished the Documentary's content. The Documentary is distinguishable from the lies that appear in celebrity gossip pages and tabloids, both in terms of its content and in terms of the profile and reach of NBCU as a publisher and distributor. As a result of the particularly broad reach of the defamatory statements alleged herein, Mr. Combs has lost significant business opportunities and revenue.

111.    Now that Defendants have maliciously poisoned the public and given Mr. Combs a false reputation as a murder and pedophile, the unrelenting tide of negative publicity resulting from Defendants' lies have caused and will continue to cause Mr. Combs significant reputational and economic harm.

112.    Defendants' intentionally false and defamatory statements have also poisoned the minds of the overwhelming majority of individuals residing in the Southern District of New

28

York who could have qualified to sit on the jury in Mr. Combs's criminal trial that concluded in July 2025. Thus, in addition to all of the other harms resulting from Defendants' unlawful false statements, they also jeopardized his ability to have a fair trial on the government's charges against him.

## FIRST CAUSE OF ACTION
### (Defamation)

113. Plaintiff repeats and re-alleges each of the foregoing paragraphs as if fully set forth herein.

114. As set forth above, Defendants made false and defamatory statements concerning the Plaintiff in the Documentary, which had the tendency to expose and, in fact, did expose Plaintiff to hatred, contempt, ridicule, and disgrace.

115. As set forth in detail above, Defendants' defamatory statements included the following false assertions:

    a.    That Plaintiff murdered Kimberly Porter, Biggie, Andre Harrell, and Heavy D, and attempted to murder Al B. Sure;

    b.    That Plaintiff had sex with and was sex trafficking underage girls; and

    c.    That Courtney Burgess was in possession of flash drives of sex tapes Plaintiff had secretly recorded and used for purposes of extortion.

116. The statements published by Defendants about Plaintiff accused Plaintiff of serious crimes and engaging in sexual misconduct.

117. The statements published by Defendants about Plaintiff tended to harm Plaintiff in his business and profession.

118. These statements published by Defendants about Plaintiff were defamatory per se.

29

Case 1:25-cv-00650-JPC    Document 106-2    Filed 04/24/26    Page 30 of 32

119.    These statements published by Defendants directly and proximately caused substantial reputational and financial harm to Plaintiff, and jeopardized his right to a fair trial on the government's charges against him.

120.    Defendants published the statements without privilege to a third party, as more fully set forth above.

121.    As set forth more fully above, Defendants acted in a grossly irresponsible and reckless manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties; among other things, Defendants did not follow sound journalistic practices in researching, preparing, or editing the Documentary. Because there was reason to doubt the accuracy of the sources relied upon, Defendants had a duty to make further inquiry and verify the information of the sources they interviewed.  The truth was easily accessible, yet Defendants willfully and/or recklessly omitted and distorted it.

122.    As set forth more fully above, Defendants published the defamatory statements with actual malice, while knowing, or at a minimum, recklessly disregarding  that the defamatory statements were false because, among other things, the causes of the deaths of Kimberly Porter, Biggie, Andre Harrell, and Heavy D were well-established, the allegation that Plaintiff engaged in sex with and sex-trafficked minor girls had been thoroughly and publicly discredited, Defendants never saw any secretly recorded sex tapes in Burgess's possession (or otherwise) or any evidence that any such tapes were used for extortion, and Defendants knew, or recklessly disregarded that the sources they relied upon for these defamatory statements were unreliable. Despite all this, Defendants published the defamatory statements anyway with the goal of driving viewership of the Documentary to increase their profit at the expense of the truth.

30

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment:

1.      Awarding Plaintiff money damages in an amount to be determined at trial, but not less than $100,000,000.00; and

2.      Granting such other and further relief as the Court deems just and proper.

## DEMAND FOR A JURY TRIAL

Plaintiff demands a jury trial.


Dated:  New York, New York
        September 12, 2025

                                        _____
                                        Michael Tremonte
                                        Erica A. Wolff
                                        Benjamin J. Shack Sackler
                                        SHER TREMONTE LLP
                                        90 Broad Street, 23rd Floor
                                        New York, N.Y.  10004
                                        Telephone: (212) 202-2600
                                        Email: mtremonte@shertremonte.com

                                        *Attorneys for Plaintiff Sean Combs*

31

**<u>EXHIBIT 1</u>**

*Diddy: The Making of a Bad Boy*

Due to the media format, Plaintiff will provide an electronic copy of this Exhibit to the Court and counsel for Defendants on removable media.

32