UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SEAN COMBS,<br><br>Plaintiff,<br><br>-v-<br><br>COURTNEY BURGESS, ARIEL MITCHELL, and NEXSTAR MEDIA INC.,<br><br>Defendants. | 25 Civ. 650 (JPC)<br><br>OPINION AND ORDER |

JOHN P. CRONAN, United States District Judge:

Plaintiff Sean Combs is a well-known musician who uses the stage names Diddy, P. Diddy, and Puff Daddy. In September 2024, he was indicted in this District on charges of racketeering, sex trafficking, and transportation to engage in prostitution, and in July 2025, he was acquitted by a jury of racketeering and sex trafficking but convicted of transportation to engage in prostitution.

This case concerns statements made about Combs in the months between his indictment and his trial. Combs alleges that Defendant Courtney Burgess falsely claimed to possess video recordings of Combs sexually assaulting celebrities and minors. Additionally, Combs claims that Defendant Ariel Mitchell—an attorney who represented Burgess—vouched for Burgess's accusations and made false statements of her own, including that a police report corroborated an accusation of rape against Combs and that Combs had used drug-laced baby oil to incapacitate his victims. Finally, Combs alleges that Defendant Nexstar Media Inc. ("Nexstar") amplified these falsehoods by broadcasting them on the cable news channel NewsNation without any investigation

and despite reason to doubt their truth.[1] Against all three Defendants, Combs brings a single cause of action for defamation.

Burgess has failed to appear in this action, but Nexstar and Mitchell now move to dismiss Combs's Amended Complaint. For reasons that follow, the Court grants Nexstar's motion in part and denies Mitchell's motion in its entirety.

## I. Background

### A. Facts[2]

Combs is a self-described "musician and music producer, hip hop impresario, record label owner, fashion innovator and icon, pathbreaking spirits entrepreneur, and committed philanthropist." Am. Compl. ¶ 19. Burgess, meanwhile, "has been described as 'a one-time industry bit player' and 'a fringe character,'" according to Combs. *Id.* ¶ 22. Although Burgess has claimed to have worked in the music industry for decades, "there exists no public record of any professional achievements and he left no detectable footprint on the industry." *Id.*

Burgess "has never met Mr. Combs and has never had any relationship with anyone in Mr. Combs's family," but he "has claimed on multiple occasions that Kim Porter, the mother of four

[1] Combs's Amended Complaint frequently refers to Nexstar as "NewsNation," the name of the cable news channel that it owns and operates. Except when quoting the Amended Complaint, this Opinion and Order uses "Nexstar" to refer to the corporate Defendant and "NewsNation" to refer to the channel and its programming.

[2] The facts herein are taken from the Amended Complaint, Dkt. 61 ("Am. Compl."), and are assumed to be true for purposes of this Opinion and Order. *See Interpharm, Inc. v. Wells Fargo Bank, N.A.*, 655 F.3d 136, 141 (2d Cir. 2011) (explaining that on a motion to dismiss pursuant to Rule 12(b)(6), the court must "assum[e] all facts alleged within the four corners of the complaint to be true, and draw[] all reasonable inferences in plaintiff's favor"). In addition, because the Amended Complaint quotes from and relies upon the three NewsNation broadcasts at issue, the Court also considers the video recordings and transcripts of those broadcasts, which Nexstar submitted in support of its motion, *see* Dkt. 73 ("McNamara Declaration"), to be incorporated by reference in and integral to the Amended Complaint. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002); *Lively v. WAFRA Investment Advisory Group, Inc.*, 6 F.4th 293, 305 (2d Cir. 2021).

children with Mr. Combs who died in 2018, provided him with a copy of her memoir and videos depicting Mr. Combs sexually assaulting inebriated celebrities and minors." *Id.* ¶ 23. Yet those who were close to Porter, "including her children and her roommate for over twenty years, had never heard of Burgess before he made this" claim. *Id.* Burgess repeated this claim "numerous times to the press and in social media appearances," including during an interview on or about October 31, 2024, at which he claimed that Porter had enlisted a mutual acquaintance to deliver to him "the first of several flash drives containing the memoir and videos that Ms. Porter supposedly intended for him to have." *Id.* ¶¶ 24-25. Burgess marketed Porter's purported memoir on Amazon.com under the title "Kim's Lost Words." *Id.* ¶ 28.

"Porter's children and her best friend publicly discredited Burgess's claims . . . , posting on social media and informing the press that [she] had never written a memoir or maintained a journal." *Id.* ¶ 29. On or about September 25, 2024, Porter's children released a statement declaring: "Claims that our mom wrote a book are simply untrue. She did not, and anyone claiming to have a manuscript is misrepresenting themselves." *Id.* (emphasis omitted). Amazon removed Burgess's book from its platform on or about October 3, 2024, after which Burgess marketed a second, "R rated" version of the book on a different website. *Id.* ¶ 30.

Combs pleads "[u]pon information and belief" that "sometime in or around September 2024, Burgess contacted Mitchell seeking to team up with a lawyer in an attempt to legitimize and/or profit from his outrageous lies." *Id.* ¶ 31. Mitchell's law practice "focus[es] on high profile cases," including claims of "sexual assault perpetrated by a celebrity." *Id.* ¶ 32. For example, in or around 2021, Mitchell brought a lawsuit against Combs and fellow musician Trey Songz on behalf of a woman claiming sexual assault by Trey Songz. *Id.* ¶ 33. "In 2022, a witness in that lawsuit testified that Mitchell had tried to bribe her to lie about witnessing the purported assault

and about being assaulted herself." *Id.* "In connection with [that] allegation[] of professional misconduct, three complaints accusing Mitchell of witness tampering were filed with the Florida Bar." *Id.* The Florida Bar thereafter filed a complaint against Mitchell and "concluded that Mitchell had violated multiple rules of professional conduct, including with respect to 'Truthfulness in Statements to Others' and 'Dishonesty, Fraud, Deceit, or Misrepresentation.'" *Id.* ¶ 35. Among other things, the Florida Bar found that Mitchell had "repeatedly misrepresented to the media the status of the [ethics] complaints against her." *Id.* ¶ 37.

In the summer of 2024, Mitchell filed another lawsuit against Combs, this one "on behalf of an adult entertainer who alleged that she had been sex trafficked by Mr. Combs." *Id.* ¶ 40. And after filing that lawsuit, Mitchell "launched a media tour in which she repeatedly offered to discuss allegations against Mr. Combs." *Id.* ¶ 41. "In exchange for press appearances to discuss the allegations," Mitchell "demanded luxury accommodations, including 'first class flights' to New York City, a minimum two-night stay at [a] '4 star minimum hotel,' onsite hair and makeup services, meals and snacks, and an unspecified 'materials fee.'" *Id.* ¶ 43.

**1. The September 27, 2024 Broadcast**

In September 2024, Combs was indicted in the Southern District of New York for racketeering, sex trafficking, and transportation to engage in prostitution, and he pleaded not guilty to those charges on September 17, 2024. *Id.* ¶ 20. Roughly ten days later, on or about September 27, 2024, NewsNation broadcast a television interview with Mitchell. *Id.* ¶ 45. During that interview, Mitchell stated that "there already have been tapes leaking around Hollywood, being shopped around to individuals in Hollywood." *Id.* Mitchell added that "one particular person contacted me to shop a particular video they were in possession of and to contact the person who was in the video to see if they were interested in purchasing the video before it became public

knowledge." *Id.* Mitchell described the potential pitch as a "catch and kill" and stated that "Mr. Combs was in the tape and this other person was, I would venture to say, more high profile than Mr. Combs." *Id.* Mitchell also confirmed that the video "exists, that it's real, that the other person in the video is very visible, it's no question if it's that person in the video, and I can tell that the video is pornographic in nature." *Id.* During the interview, the NewsNation host "said to Mitchell: '[I]t sounds like there was probably a lot of hidden cameras as well.'" *Id.* ¶ 46. In response, Mitchell "confirmed this and then further stated that, based on her review of the supposed . . . evidence, it 'doesn't seem like the person knows they're being videotaped . . . [it is] like they're being surreptitiously recorded.'" *Id.* ¶ 47 (alterations in original).

The Amended Complaint alleges that these statements were false: "Mitchell never possessed 'surreptitiously recorded' 'pornographic' images involving Mr. Combs and any celebrity and was never able to confirm the existence of any such video of Mr. Combs." *Id.* ¶ 48. The Amended Complaint further alleges that NewsNation "conducted no investigation before broadcasting the false allegations, though it easily could have done so," notwithstanding "Mitchell's already documented history of making false claims against celebrities." *Id.* ¶ 49.

During the same broadcast, Mitchell also discussed a client of hers "who alleged that Mr. Combs sexually assaulted her in Northern California in 2018." *Id.* ¶ 51. Mitchell asserted that her client's claims "were corroborated," stating that there was "a police report . . . that was made in 2018." *Id.* ¶ 52 (alterations in original). The NewsNation host responded, "you guys actually have one," and asked, "Are we going to be able to see it?" *Id.* Mitchell responded, "Yes, as soon as I file my lawsuit in civil court, I will be attaching the criminal complaint that was made." *Id.* ¶ 53.

According to the Amended Complaint, "there is no police report corroborating Mitchell's client's claim against Mr. Combs" and the client's allegations are "false." *Id.* ¶¶ 51, 54. In fact,

"the police report that Mitchell's client actually filed . . . stated that Mitchell's client was tragically raped by Shane Pearce and another white man" and "does not mention Mr. Combs, who is Black." *Id.* ¶ 54. Mitchell's client had "publicly filed the actual report together with a sworn statement confirming its substance . . . in connection with a domestic violence proceeding on or about July 8, 2019," and the report remained publicly available at the time of Mitchell's September 27, 2024 interview on NewsNation. *Id.* ¶¶ 54, 58. "Roughly two weeks after the broadcast, Mitchell filed the lawsuit she had previewed," but "the lawsuit did not attach any police report." *Id.* ¶ 55.

The Amended Complaint alleges that NewsNation "did nothing to confirm the existence of a police report corroborating Mitchell's client's claims" before broadcasting these allegations. *Id.* ¶ 57. At the conclusion of the segment, the host told viewers: "These are allegations, of course. [Combs] has not responded. But we will follow it as we move along this developing story." McNamara Decl., Ex. 4 at 7. And yet, NewsNation has "still not corrected the false statements it published on September 27, 2024," even despite "a January 19, 2025 NewsNation follow-up interview with Mitchell and her client about allegations involving the 2018 police report." *Id.* ¶ 62.

**2. The October 7, 2024 Broadcast**

On October 7, 2024, Mitchell appeared on NewsNation again, this time claiming "that she had done 'research' indicating that baby oil may be used as a 'conduit' for transmitting drugs 'mixed into the oil' to another person for the purpose of incapacitating them." *Id.* ¶ 74. Mitchell suggested that Combs "did this to one of her clients—*i.e.*, mixed drugs with baby oil and doused her client with it, thereby 'lowering her defenses.'" *Id.* ¶ 75. "That statement was a lie" because "Mitchell performed no such research, and even if she had, there is no scientific basis for asserting that baby oil could be infused with drugs to incapacitate anyone." *Id.* Indeed, although "the

evidence at Mr. Combs's criminal trial proved that [] baby oil was purchased [by Combs]," "there was no evidence . . . that any baby oil was used as a conduit for transmitting drugs." *Id.*

**3. The October 31, 2024 Broadcast and Courthouse Interview**

On or about October 31, 2024, Mitchell appeared on NewsNation for a third time, on this occasion alongside her client, Burgess. *Id.* ¶ 63. The host introduced the interview by announcing that Burgess "just testified before a federal grand jury. He says he was in possession of a trove of digital evidence of Diddy's 'freak offs' and parties. His name is Courtney Burgess, and he says a friend gave him 11 flash drives that belonged to the late Kim Porter . . . Diddy's ex-girlfriend and the mother of four of his kids. On those drives, the witness says, eight videos featured eight celebrities at Diddy 'freak offs' or parties and that six were males, two were females." *Id.* (alterations in original). The host added that the drives "included a manuscript of an alleged Kim Porter memoir, a memoir that her four kids insist is fake." McNamara Decl., Exh. 6 at 2. The host also stated that "because the eight people in the videos, the eight celebrities in the videos were allegedly victims of sex crimes, we know who they are, but we will not be naming them, famous or not." Am. Compl. ¶ 64.

Following this introduction, and in response to the host's questioning, Burgess stated that of the "eight celebrities 'who were recorded having intimate relations with Sean Combs,' 'two to three, possibly three' appeared to be minors, 'all' appeared inebriated, and 'all, to be honest' were 'victims' of sexual assault." *Id.* ¶ 66; *accord* McNamara Decl., Exh. 6 at 3-4. Burgess also repeated his claims about Porter giving him her memoir: when the host asked, "Do you know if the notes from the book really were from Kim Porter?", Burgess responded, "Yes, because I spoke to her probably like six hours before I got it, received it." Am. Compl. ¶ 67. Toward the end of the segment, the host reminded viewers that Combs "has not been convicted of any crimes" and

that "everything against him is an allegation until it is proven in a court of law." McNamara Decl., Exh. 6 at 6.

On or about the same day, Mitchell made similar statements during a separate interview that she and Burgess gave outside of the federal courthouse in Manhattan. Am. Compl. ¶ 70. When a reporter asked, "I know you can't mention celebrities per se. You did mention some in the interview. So, just to clarify, you can back that up with actual factual footage?", Mitchell responded, "We have, yeah, it's things that we have." *Id.*

**4. The January 14, 2025 Documentary**

Mitchell also appeared in a documentary, *The Making of a Bad Boy*, that aired on NBC's streaming platform Peacock on January 14, 2025. *Id.* ¶ 71. In the documentary, Mitchell stated that Burgess "has done interviews where he purported to own several flash drives that included sex tapes with eight distinct individuals, including a-list celebrities and Diddy, all engaged in sex. He believes that these people were intoxicated and that they may not have known that they were being recorded." *Id.* Mitchell then explained that Combs had made the sex videos "to advance his influence and his power. Because now I have them on video, where I can say, I'm going to take this to your wife. I'll take this to your husband. I'll take this to the public. And I'll ruin you if you don't do this for me." *Id.* ¶ 72. Mitchell further stated that Combs "is a man who has done awful things to hundreds, maybe thousands of people." *Id.* ¶ 73.

* * *

The Amended Complaint alleges that "Defendants eagerly peddled these lies to enrich themselves." *Id.* ¶ 76. Burgess profited from Porter's fake memoir, which "briefly rose to the top of [Amazon's] best-seller list" before its removal from that website. *Id.* Mitchell "has seized every opportunity to promote herself in the media and has insisted on valuable benefits and

payments in exchange for interviews." *Id.* ¶ 77. And NewsNation "has likewise profited from repeating and amplifying Burgess's and Mitchell's lies, drawing viewers and promoting its programming based on wholly unsubstantiated lies." *Id.* ¶ 78.

Combs alleges that he "has suffered significant reputational and economic harm" as a result of Defendants' statements. *Id.* ¶ 82. "People who heard and believed Defendants' lies have accused Mr. Combs, on social media that is consumed by hundreds of millions of viewers each and every day, of being a debauched 'monster' and a pedophile," and "many viewers of the social media posts in which Defendants' falsehoods are published and republished post harassing and threatening messages against Mr. Combs." *Id.* ¶ 83. Combs further alleges that Defendants' statements "poisoned the minds of the overwhelming majority of individuals residing in the Southern District of New York who could have qualified for jury service" at his criminal trial and thereby "jeopardized his opportunity for a fair trial on the government's charges against him." *Id.* ¶ 84.

**B. Procedural History**

Combs initiated this action on January 22, 2025, Dkt. 1, and filed a Corrected Complaint on February 3, 2025, Dkt. 16. After Mitchell and Nexstar moved to dismiss the Corrected Complaint, Dkts. 51, 55, Combs filed an Amended Complaint on August 11, 2025, Dkt. 61. Relying on this Court's diversity jurisdiction, Am. Compl. ¶ 16, the Amended Complaint asserts a single cause of action for defamation against Burgess, Mitchell, and Nexstar, *id.* ¶¶ 85-95, and seeks money damages "in an amount to be determined at trial, but not less than $100,000,000.00," *id.* at 24.

As relevant here, the Amended Complaint identifies seven allegedly defamatory statements:

> (1) "That there existed video recordings of Plaintiff sexually assaulting minors and celebrities," which Burgess, Mitchell, and NewsNation published on or about October 31, 2024;
>
> (2) "That Plaintiff secretly recorded himself having sex with people who did not know they were being recorded," which Mitchell and NewsNation published on or about September 27, 2024 and October 31, 2024;
>
> (3) "That Plaintiff used secretly recorded videos of him having sex with people who did not know they were being recorded in order to threaten or extort sexual partners," which Mitchell published on January 14, 2025;
>
> (4) "That a police report existed that corroborated the outrageous allegations made by Mitchell's client that she was raped by Plaintiff in Northern California in March 2018," which Mitchell and NewsNation published on or about September 27, 2024;
>
> (5) "That Combs used drug-laced baby oil to incapacitate people," which Mitchell and NewsNation published on or about October 7, 2024;
>
> (6) "That possessing the purported videos of Combs sexually assaulting minors and celebrities and possessing a tell-all memoir of the mother of Combs's children, put Burgess in danger for his life," which Burgess published on or about October 31, 2024; and
>
> (7) "That Plaintiff sexually assaulted and/or threatened, exploited, or secretly recorded in sex acts 'hundreds, maybe thousands of people,'" which Mitchell published on January 14, 2025.

Am. Compl. ¶ 86. For ease of reference, the Court refers to these statements as Statements 1 through 7, in the order in which they appear in the Amended Complaint. Statements 1, 2, 4, and 5 are alleged against Nexstar, Statements 1 through 5 and Statement 7 are alleged against Mitchell, and Statements 1 and 6 are alleged against Burgess.

Nexstar moved to dismiss the Amended Complaint on September 19, 2025, Dkt. 72 ("Nexstar Motion"), and in support of its motion, submitted video recordings and transcripts of the three NewsNation broadcasts at issue, Dkt. 73. Mitchell then separately moved to dismiss the Amended Complaint on September 30, 2025. Dkt. 77 ("Mitchell Motion"). Combs opposed both motions on October 28, 2025. Dkt. 82 ("Opposition to Nexstar Motion"); Dkt. 83 ("Opposition to

Mitchell Motion"). Nexstar filed a reply in further support of its motion on December 5, 2025, Dkt. 94 ("Nexstar Reply"); Mitchell did not file a reply.[3]

Burgess has not appeared in this action. On November 17, 2025, the Court granted Combs's motion for leave to serve Burgess by alternative means. Dkt. 87. On January 15, 2026, Combs filed affidavits of service upon Burgess, Dkts. 99, 100, and on April 30, 2026, the Clerk of Court entered a certificate of default for Burgess, Dkt. 112. Combs's claim against Burgess is not addressed in this Opinion and Order.

## II. Legal Standard

To survive a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Accordingly, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Moreover, although a court must "accept[] as true the factual allegations in the complaint and draw[] all inferences in the plaintiff's favor," *Biro v. Condé Nast*, 807 F.3d 541, 544 (2d Cir. 2015), it need not "accept as true legal conclusions couched as factual allegations," *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475-76 (2d Cir. 2009).

[3] Nexstar and Combs requested oral argument on the motions to dismiss. *See* Dkts. 75, 84. Because the Court decides the motions in this Opinion and Order without the need for oral argument, the requests are denied as moot.

## III. Discussion

### A. Applicable Law

Defamation, which "consist[s] of the twin torts of libel and slander, is the invasion of the interest in a reputation and good name." *Hogan v. Herald Co.*, 446 N.Y.S.2d 836, 839 (4th Dep't 1982). "Generally, spoken defamatory words are slander," whereas "written defamatory words are libel." *Albert v. Loksen*, 239 F.3d 256, 265 (2d Cir. 2001). Here, Combs's claims sound in slander because they are premised on words spoken by Mitchell and broadcast by NewsNation. "The elements of a cause of action for slander under New York law are (i) a defamatory statement of fact, (ii) that is false, (iii) published to a third party, (iv) of and concerning the plaintiff, (v) made with the applicable level of fault on the part of the speaker, (vi) either causing special harm or constituting slander per se, and (vii) not protected by privilege." *Id.* at 265-66 (internal quotation marks omitted).

Among these elements, six issues are particularly important here. First, a defamation action "cannot be maintained unless it is premised on published assertions of fact." *Brian v. Richardson*, 660 N.E.2d 1126, 1129 (N.Y. 1995) (emphasis omitted). "Expressions of opinion, as opposed to assertions of fact, . . . cannot be the subject of an action for defamation." *Mann v. Abel*, 885 N.E.2d 884, 885-86 (N.Y. 2008). The question of whether a challenged statement is fact or opinion is an issue of law decided by a court, *Rinaldi v. Holt, Rinehart & Winston, Inc.*, 366 N.E.2d 1299, 1306 (N.Y. 1977), and it "must be answered on the basis of what the average person hearing or reading the communication would take it to mean," *Steinhilber v. Alphonse*, 501 N.E.2d 550, 553 (N.Y. 1986). New York courts look to three factors in making that determination: "(1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the

communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal readers or listeners that what is being read or heard is likely to be opinion, not fact." *Gross v. N.Y. Times Co.*, 623 N.E.2d 1163, 1167 (N.Y. 1993) (internal quotation marks omitted). "[T]he third factor in the analysis is often the key consideration in categorizing a statement as fact or opinion." *Davis v. Boeheim*, 22 N.E.3d 999, 1006 (N.Y. 2014) (internal quotation marks omitted). Special attention is therefore due to the "apparent scope and intent" of the communication as a whole, *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 177 (2d Cir. 2000) (internal quotation marks omitted), "the larger context in which the statements were published, including the nature of the particular forum," *Brian*, 660 N.E.2d at 1130, and "the existence of any applicable customs or conventions which might signal to readers or listeners that what is being read or heard is likely to be opinion, not fact," *Steinhilber*, 501 N.E.2d at 554 (internal quotation marks omitted).

New York law also makes a further distinction between "pure opinions" and "mixed opinions." There is absolute protection for a "pure opinion," which is a statement of opinion "accompanied by a recitation of the facts upon which it is based," or one that "does not imply that it is based upon undisclosed facts." *Id.* at 552. But on the other hand, there is no protection for a "mixed opinion"—a statement which "implies that it is based upon facts which justify the opinion but are unknown to those reading or hearing it." *Id.* at 552-53. "The actionable element of a 'mixed opinion' is not the false opinion itself—it is the implication that the speaker knows certain facts, unknown to his audience, which support his opinion and are detrimental to the person about whom he is speaking." *Id.* at 553.

Second, a defamation plaintiff "must identify how the defendant's statement was false" to survive a motion to dismiss. *Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236,

244 (2d Cir. 2017); *see also Guccione v. Hustler Mag., Inc.*, 800 F.2d 298, 301 (2d Cir. 1986) ("[It is] fundamental that truth is an absolute, unqualified defense to a civil defamation action." (internal quotation marks omitted)). In this context, falsity "overlooks minor inaccuracies." *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 516 (1991). A statement is "substantially true"—and thus not actionable—if it "would not have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Tannerite*, 864 F.3d at 242-43 (internal quotation marks omitted). Put differently, "it is not necessary to demonstrate complete accuracy to defeat a charge of [defamation]. It is only necessary that the gist or substance of the challenged statements be true." *Printers II, Inc. v. Pros. Publ'g, Inc.*, 784 F.2d 141, 146 (2d Cir. 1986).

Third, it is a "black-letter rule that one who republishes a libel [or slander] is subject to liability just as if he had published it originally, even though he attributes the [defamatory] statement to the original publisher." *Cianci v. New Times Publ'g Co.*, 639 F.2d 54, 60-61 (2d Cir. 1980) (internal quotation marks omitted); *accord Enigma Software Grp. USA LLC v. Bleeping Comput. LLC*, 194 F. Supp. 3d 263, 287 (S.D.N.Y. 2016) ("A speaker who repeats another's defamatory statement is not made immune from liability for defamation merely because another person previously made the same demeaning claim." (citations omitted)). Indeed, "[a]ny different rule would permit the expansion of a defamatory private statement, actionable but without serious consequences, into an article reaching thousands of readers, without liability on the part of the republisher." *Cianci*, 639 F.2d at 61.

Fourth, with regard to the level of fault that a defamation plaintiff must establish, Combs concedes that he is a public figure, and therefore must show that Defendants acted with actual malice. *See* Nexstar Motion at 12; Opposition to Nexstar Motion at 8; Mitchell Motion at 13-14; Opposition to Mitchell Motion at 8. Actual malice requires "knowledge that [the statement] was

false or . . . reckless disregard of whether it was false or not." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964). Because this inquiry is subjective, the test is not "whether a reasonably prudent man would have published, or would have investigated before publishing." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). Rather, "[t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication," *id.*, or acted with a "high degree of awareness of . . . probable falsity," *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964). There is also "a critical difference between not knowing whether something is true and being highly aware that it is probably false," and "[o]nly the latter establishes reckless disregard in a defamation action." *Liberman v. Gelstein*, 605 N.E.2d 344, 350 (N.Y. 1992); *see Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 692 (1989) ("Although failure to investigate will not alone support a finding of actual malice, the purposeful avoidance of the truth is in a different category." (internal citation omitted)).

Even though "actual malice is subjective, a court typically will infer actual malice from objective facts." *Celle*, 209 F.3d at 183 (internal quotation marks omitted). Actual malice thus may be established "through the defendant's own actions or statements, the dubious nature of his sources, [and] the inherent improbability of the story among other circumstantial evidence." *Id.* (citation modified); *see St. Amant*, 390 U.S. at 732 ("[R]ecklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports."). Taken on its own, a circumstantial fact such as "a showing of ill will," *Harte-Hanks*, 491 U.S. at 666, or the desire to profit or to attract an audience, *see, e.g.*, *Bloom v. A360 Media LLC*, 735 F. Supp. 3d 466, 474 (S.D.N.Y. 2024), is insufficient to demonstrate actual malice. But such evidence may be weighed alongside "an accumulation of the evidence and appropriate inferences" which

collectively may "support[] the existence of actual malice," *Celle*, 209 F.3d at 183 (citation modified).

At trial, a public figure must prove actual malice by clear and convincing evidence, *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974), but on a motion to dismiss, a plaintiff only "must plead 'plausible grounds' to infer actual malice by alleging 'enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of' actual malice." *Biro v. Condé Nast*, 807 F.3d 541, 546 (2d Cir. 2015) (quoting *Twombly*, 550 U.S. at 556). In determining whether that standard has been met, two principles are important here. First, because actual malice is measured at the time of publication, "information acquired after the publication of [allegedly] defamatory material cannot be relevant to the publisher's state of mind." *Herbert v. Lando*, 781 F.2d 298, 305-06 (2d Cir. 1986). Second, when the defendant is an organization, actual malice must be "brought home to the persons in the . . . organization having responsibility for the publication." *Sullivan*, 376 U.S. at 287.

Fifth, slander is generally "not actionable unless the plaintiff suffers special damage[s]," which is "the loss of something having economic or pecuniary value." *Liberman*, 605 N.E.2d at 347 (internal quotation marks omitted); *see Celle*, 209 F.3d at 179 (special damages "must flow directly from the injury to reputation caused by the defamation" (internal quotation marks omitted)). But a plaintiff may prevail without pleading special damages when a statement is slanderous *per se*—a category that includes statements "(i) charging plaintiff with a serious crime; (ii) that tend to injure another in his or her trade, business or profession; (iii) that plaintiff has a loathsome disease; or (iv) imputing unchastity to a woman." *Liberman*, 605 N.E.2d at 347. "When statements fall within one of these categories, the law presumes that damages will result, and they need not be alleged or proven." *Id.* at 347-48. As relevant here, accusations of rape, sexual assault,

and drugging plainly charge serious crimes. *See, e.g.*, *Franco v. Diaz*, 51 F. Supp. 3d 235, 244-45 (E.D.N.Y. 2014).

Sixth and finally, an otherwise defamatory statement may be shielded by New York's common-law protections for statements connected to litigation or by New York's statutory fair report privilege. As to the former, in New York it is "well-settled that statements made in the course of litigation are entitled to absolute privilege." *Front, Inc. v. Khalil*, 28 N.E.3d 15, 18 (N.Y. 2015). Under this privilege, which exists "for the benefit of the public, to promote the administration of justice," "the protected participants include the Judge, the jurors, the attorneys, the parties and the witnesses." *Park Knoll Assocs. v. Schmidt*, 451 N.E.2d 182, 184 (N.Y. 1983). But because this immunity extends only to statements "spoken in office," a lawyer cannot claim immunity "for words spoken while representing a client in a nonjudicial proceeding." *Id.* at 184-85 (citations omitted). Relatedly, for "statements made prior to the commencement of an anticipated litigation," a privilege may not be claimed if those "statements were not pertinent to a *good faith* anticipated litigation." *Front*, 28 N.E.3d at 19-20 (emphasis added). That limitation "ensures that [the] privilege does not protect attorneys who are seeking to bully, harass, or intimidate their client's adversaries by threatening baseless litigation or by asserting wholly unmeritorious claims, unsupported in law and fact, in violation of counsel's ethical obligations." *Id.* at 19.

In addition to New York's common-law protections for litigation statements, Section 74 of the New York Civil Rights Law provides that "[a] civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of any judicial proceeding, legislative proceeding or other official proceeding." N.Y. Civ. Rts. L. § 74. Under this provision, a publication qualifies as a "fair and true report" if it is "substantially accurate," so even if it

contains "minor inaccuracies," a publication will be protected as long as it "does not produce a different effect on a reader than would a report containing the precise truth." *Karedes v. Ackerley Grp., Inc.*, 423 F.3d 107, 119 (2d Cir. 2005) (internal quotation marks omitted). Additionally, the term "official proceeding" has been construed broadly to embrace activities such as government investigations. *See Cholowsky v. Civiletti*, 887 N.Y.S.2d 592, 595 (2d Dep't 2009); *Freeze Right Refrigeration & Air Conditioning Servs., Inc. v. City of New York*, 475 N.Y.S.2d 383, 388 (1st Dep't 1984). The privilege applies, however, only where "the ordinary viewer or reader" can "determine from the publication itself that [it] is reporting on" an official proceeding. *Kinsey v. N.Y. Times Co.*, 991 F.3d 171, 178 (2d Cir. 2021) (internal quotation marks omitted). A mere "overlap between the subject matter of the report and the subject matter of a proceeding does not suffice." *Carroll v. Trump*, 664 F. Supp. 3d 550, 558 (S.D.N.Y. 2023) (internal quotation marks omitted). As a result, this privilege does not extend to any reporting "on underlying events" themselves, *id.* (internal quotation marks omitted), or statements that "suggest[] more serious conduct than that actually suggested in the official proceeding," *Daniel Goldreyer, Ltd. v. Van de Wetering*, 630 N.Y.S.2d 18, 22 (1st Dep't 1995).

**B. Analysis**

**1. Nexstar**

Combs's defamation claim against Nexstar is based on four of the seven allegedly defamatory statements—Statements 1, 2, 4, and 5. Each of these statements arises from NewsNation's broadcasting of statements made by Mitchell or by both Mitchell and Burgess. Statement 1 is Burgess's assertion[4] on October 31, 2024, that there existed video recordings of

[4] While the Amended Complaint also alleges liability for Statement 1 against Mitchell, Am. Compl. ¶¶ 85(a), Mitchell allegedly stated that there are videos of Combs sexually assaulting

Combs sexually assaulting minors and celebrities, Statement 2 is Mitchell's statement also on October 31 that Combs secretly recorded himself having sex with people who did not know they were being recorded, Statement 4 is Mitchell's assertion on September 27, 2024, that a police report corroborated her client's claim that Combs raped her in 2018, and Statement 5 is Mitchell's accusation on October 7, 2024, that Combs used drug-laced baby oil to incapacitate people. *See* Am. Compl. ¶ 86.

As to Statements 1, 2, and 4, Combs has failed to plead plausible grounds to allow an inference of actual malice on the part of Nexstar.[5] Where, as here, a publisher broadcasts the allegations of a third party, actual malice exists only "where there are *obvious* reasons to doubt the veracity of the informant or the accuracy of his reports." *St. Amant*, 390 U.S. at 732 (emphasis added). "Even highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers cannot alone establish actual malice." *Satanic Temple, Inc. v. Newsweek Digit. LLC*, 177 F.4th 202, 214 (2d Cir. 2026).

To be sure, Combs alleges that NewsNation "conducted no investigation," did no "fact checking," and never "reach[ed] out to Mr. Combs's representatives for comment." Am. Compl. ¶¶ 49, 57. But a failure to investigate, standing alone, "is not sufficient to establish reckless disregard." *Harte-Hanks*, 491 U.S. at 688. Similarly, although Combs alleges that NewsNation "profited" from broadcasting Mitchell's statements by "drawing viewers," Am. Compl. ¶ 78, a

minors and celebrities during a YouTube broadcast outside the federal courthouse in Manhattan, not on NewsNation, *id.* ¶ 70.

[5] Because Combs has failed to adequately plead actual malice by Nexstar as to Statements 1, 2, and 4, the Court does not reach Nexstar's alternative arguments that those statements are nonactionable opinion or speculation, are substantially true, or are protected by New York's fair report privilege. *See* Nexstar Motion at 19-24.

publisher's "motive in publishing a story . . . cannot provide a sufficient basis for finding actual malice," *Harte-Hanks*, 491 U.S. at 665; *see also Sweeney v. Prisoners' Legal Servs. of N.Y., Inc.*, 647 N.E.2d 101, 105 (N.Y. 1995) ("[Defendants] could not have been improperly motivated unless they were aware [their source's] complaint was false."). Even taking these two factors together is not enough to create a plausible inference of the "purposeful avoidance of the truth" that is required for actual malice at the pleading stage. *Harte-Hanks*, 491 U.S. at 692. If it were, then any profit-seeking news organization could face liability for its failure to investigate, contrary to the principle that a publisher is not "required to seek out contrary stories" to insulate itself from a finding of actual malice. *McDougal v. Fox News Network, LLC*, 489 F. Supp. 3d 174, 187 (S.D.N.Y. 2020).

Combs also argues that Mitchell's and Burgess's lack of credibility should have been obvious to NewsNation. *See* Opposition to Nexstar Motion at 22-23, 24. Combs alleges that Mitchell had a "documented history of making false claims against celebrities," Am. Compl. ¶ 49, based in large part on the yet-unproven accusation that Mitchell engaged in witness tampering in an earlier lawsuit where Combs was initially named as a defendant, *see id.* ¶¶ 33-34. But the Amended Complaint does not allege that anyone at NewsNation responsible for the broadcasts actually knew of Mitchell's history, and even if they did, an unproven accusation does not supply "obvious reasons" to believe that everything Mitchell said thereafter was false, *St. Amant*, 390 U.S. at 732; *see Sweeney*, 647 N.E.2d at 104 (holding that the defendants did not act with actual malice in reporting about a violent incident at a prison based on the account of "a convicted felon who had been administratively disciplined and who had not suffered serious injuries during the alleged incident"); *Biro*, 807 F.3d at 546 n.4 (discounting an allegation of a speaker's "defamatory propensities" that "rest[ed] entirely on a lawsuit . . . not adjudicated on the merits").

The same is true for NewsNation's publication of Burgess's account during the October 31, 2024 joint interview with Mitchell and Burgess. By that point, Burgess had testified under oath before a federal grand jury and his account was being echoed by Mitchell, an attorney professing familiarity with the underlying evidence. Am. Compl. ¶¶ 63-70. Moreover, NewsNation presented Burgess's claims as exactly what they were: allegations. During the October 31 segment, the host reminded viewers that Combs "has not been convicted of any crimes" and that "everything against him is an allegation until it is proven in a court of law." McNamara Decl., Exh. 6 at 6; *see also* McNamara Decl., Ex. 4 (September 24, 2024 interview) at 7 ("These are allegations, of course."); *cf. Edwards v. Nat'l Audubon Soc'y, Inc.*, 556 F.2d 113, 120 (2d Cir. 1977) ("If we are to enjoy the blessings of a robust and unintimidated press, we must provide immunity from defamation suits where the journalist believes, reasonably and in good faith, that his report accurately conveys the charges made.").

In addition to arguing that NewsNation improperly published Mitchell's and Burgess's accusations, Combs also contends that NewsNation independently suggested to viewers that such accusations were accurate when its hosts noted, during the September 27, 2024 broadcast, that "[i]t sounds like there was probably a lot of hidden cameras as well"; stated, during that same broadcast, that "you guys actually have [a police report of Combs's supposed assault of Mitchell's other client in California]"; and commented, during the October 31, 2024 broadcast, that "we know who [the individuals in the videos] are, but we will not be naming them." Opposition to Nexstar Motion at 5-6, 10, 13, 16; *see* Am. Compl. ¶¶ 46, 52, 64. The problem with this argument is that when each remark is viewed "against the whole apparent scope and intent" of the segments in which they appeared, *Celle*, 209 F.3d at 177 (internal quotation marks omitted), it is apparent that they were an interviewer's questions, paraphrases, or introductions of a speaker—not the hosts' independent

assertions of fact. The "hidden cameras" remark was posed to Mitchell, who promptly confirmed it, McNamara Decl., Exh. 4 at 6; Am. Compl. ¶¶ 46-47, the "you guys actually have [a police report]" comment restated what Mitchell had just claimed to be true, McNamara Decl., Exh. 4 at 6; Am. Compl. ¶ 52, and the host's professed knowledge of "who they are" was derived entirely from Mitchell's and Burgess's account of what the videos showed, as the segment later made clear, McNamara Decl., Exh. 6 at 2-4; Am. Compl. ¶¶ 63-64. Viewed in context, then, the NewsNation hosts did not "espouse[] or concur[] in the charges made" by Mitchell and Burgess. *Edwards*, 556 F.2d at 120.

With regard to Statement 5, however, Combs has alleged facts that, in light of the relaxed standard at the pleading stage, allow a plausible inference that NewsNation acted with actual malice. The Amended Complaint alleges that Mitchell's claims that baby oil may be used as a "conduit" for transmitting drugs "mixed into the oil" and that Combs had doused her client in drug-laced baby oil to "lower[] her defenses," Am. Compl. ¶¶ 74-75, were so inherently improbable as to make broadcasting those claims reckless absent further investigation. *See St. Amant*, 390 U.S. at 732 (actual malice may exist when "allegations are so inherently improbable that only a reckless man would have put them in circulation"); *Celle*, 209 F.3d at 183 ("Actual malice can be established through . . . the inherent improbability of the story." (citation modified)). According to the Amended Complaint, "there is no scientific basis for asserting that baby oil could be infused with drugs to incapacitate anyone," Am. Compl. ¶ 75, and in the view of the Court, it is plausible that anyone who heard such a claim would at the very least entertain serious doubts as to its accuracy—even if they might not know it to be false. *Cf. Khawar v. Globe Int'l, Inc.*, 965 P.2d 696, 709-10 (Cal. 1998) (sustaining a finding of actual malice against a tabloid that republished the "highly improbable claim" that a bystander, rather than Sirhan Sirhan, had assassinated Robert

F. Kennedy). Statement 5 is thus unlike Statements 1, 2, and 4, for which there is no plausible reason to infer that anyone broadcasting such a statement must have had a "high degree of awareness of . . . probable falsity." *Garrison*, 379 U.S. at 74. Of course, none of this is to say that Combs ultimately will prevail against Nexstar as to Statement 5, but for purposes of the present motion, his allegation of actual malice suffices to survive Rule 12(b)(6).

Nexstar's only other argument for dismissing Combs's claim as to Statement 5 is that Mitchell's baby-oil statements were nonactionable "opinion and speculation" because they were couched in phrases like "it seems to me." Nexstar Motion at 22. But an assertion that Combs drugged a woman in order to incapacitate her cannot be "transformed into a nonactionable expression of opinion merely because it is couched in the form of an opinion." *Gross*, 623 N.E.2d at 1169 (citation modified). After all, "the statement, 'In my opinion Jones is a liar,' can cause as much damage to reputation as the statement, 'Jones is a liar.'" *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 19 (1990). It "would be destructive of the law of [slander] if a [speaker] could escape liability for accusations of [defamatory conduct] simply by using, explicitly or implicitly, the words 'I think'"—or, as here, the words "it seems to me." *Cianci*, 639 F.2d at 64.[6]

[6] In its motion, Nexstar requests attorneys' fees under New York's Anti-Strategic Lawsuits Against Public Participation statute, which authorizes an award of fees when an "action involving public petition and participation was commenced or continued without a substantial basis in fact and law and could not be supported by a substantial argument for the extension, modification or reversal of existing law." N.Y. Civ. Rts. L. § 70-a(1)(a). Courts in this District disagree about whether this provision applies to actions in federal court. *Compare Bobulinski v. Tarlov*, 758 F. Supp. 3d 166, 182-89 (S.D.N.Y. 2024) (holding that it does), *with Nat'l Academy of Television Arts & Scis., Inc. v. Multimedia Sys. Design, Inc.*, 551 F. Supp. 3d 408, 431-32 (S.D.N.Y. 2021) (holding that it does not); *cf. La Liberte v. Reid*, 966 F.3d 79, 87-88 (2d Cir. 2020) (holding California's analogous statute inapplicable in federal court). The Court need not take sides in this debate, however, because Combs's defamation claim against Nexstar survives in part, such that this action was not "commenced or continued without a substantial basis in fact and law." Nexstar's request for fees is therefore denied.

**2. Mitchell**

Combs's claim against Mitchell relies on six of the seven allegedly defamatory statements—Statements 1 through 5 and Statement 7. Mitchell argues that the claim against her should be dismissed for four reasons, but none of them persuades.

First, Mitchell argues that Combs has not alleged that she made statements of fact because her statements about her client's police report and the "shopping around" of sex tapes are not "capable of being proven true or false," all her comments "only follow[ed] statements by others," and any statements that can be attributed solely to her were "pure opinion" or "rhetorical hyperbole." Mitchell Motion at 12, 15-17. Mitchell's argument misses the mark. Whether a particular police report corroborates an allegation of rape and whether a particular sex tape exists are clearly questions of fact that are "capable of being proven false." *Brian*, 660 N.E.2d at 1129. Additionally, even if Mitchell was merely conveying Burgess's account, it is a "black-letter rule that one who republishes a libel [or slander may be] subject to liability . . . even though he attributes the [defamatory] statement to the original publisher." *Cianci*, 639 F.2d at 60-61 (internal quotation marks omitted). Finally, Mitchell's accusations that Combs sexually assaulted celebrities and minors, secretly recorded his sexual partners, used those recordings to extort people, drugged a woman with drug-laced baby oil, and victimized "hundreds, maybe thousands of people" are not inactionable opinion or hyperbole because they carry precise meanings that are readily understood. *See Gross*, 623 N.E.2d at 1167. Nor would anything about the context of interviews on national news programs, in a documentary, and on the courthouse steps, delivered by an attorney professing firsthand familiarity with the evidence, "signal [to] . . . listeners that what is being . . . heard is [not] likely to be [a] fact." *Id.* (internal quotation marks omitted).

Second, Mitchell argues that Combs has not pleaded special damages. Mitchell Motion at 17-18. But regardless of whether this is true, Combs alleges that Mitchell accused him of serious crimes such as rape, sexual assault, drugging, and extortion, and such accusations are slanderous *per se*. *See Liberman*, 605 N.E.2d at 347. Combs therefore did not need to plead special damages.

Third, Mitchell argues that her statements are shielded by New York's common-law protections for statements made in the course of judicial proceedings and the fair report privilege codified in Section 74 of the New York Civil Rights Law. Mitchell Motion at 18-23. The Court disagrees. First, each of Mitchell's statements were made to the media, *see* Am. Compl. ¶¶ 45-47, 51-53, 63-75, and thus were not "words spoken in a judicial proceeding," *Park Knoll*, 451 N.E.2d at 184. Second, Mitchell's accusations were not "statements made prior to the commencement of an anticipated litigation." *Front*, 28 N.E.3d at 20. With respect to Statement 4, even though Mitchell's client in California did sue Combs, "the lawsuit did not attach any police report," Am. Compl. ¶ 55, so Mitchell's statements about that report were not "pertinent" to that litigation, *Front*, 28 N.E.3d at 19-20. Finally, Mitchell's statements were not a "fair and true report" of any official proceedings because Combs alleges that her statements "suggest[ed] more serious conduct than that actually suggested in [any] official proceeding." *Daniel Goldreyer*, 630 N.Y.S.2d at 22.[7]

Mitchell's final argument for dismissal is that Combs has not adequately alleged actual malice. Mitchell Motion at 23-26. This argument fails because Combs alleges that Mitchell repeatedly professed personal knowledge of evidence that did not exist and that she had no basis

---

[7] Mitchell briefly argues "that a qualified privilege arises where a person makes a bona fide communication upon a subject in which he has an interest and the communication is made to a person having a corresponding interest." Mitchell Motion at 19 (internal quotation marks omitted). But even if such a privilege applied here, it would be defeated by Combs's allegations of actual malice by Mitchell. *See Chandok v. Klessig*, 632 F.3d 803, 815 (2d Cir. 2011) ("A qualified privilege may be overcome by a showing [] of 'actual' malice (*i.e.,* knowledge of the statement's falsity or reckless disregard as to whether it was false).").

to believe existed. *See St. Amant*, 390 U.S. at 732 (explaining that actual malice may exist "where a story is fabricated by the defendant" or "is the product of his imagination"). For example, Mitchell confirmed that she could "tell that the video [of Combs] is pornographic in nature," Am. Compl. ¶ 45, even though Combs alleges she "never possessed" any such video, *id.* ¶ 48. She announced that "[w]e also have a police report," *id.* ¶ 52, even though it is alleged that "there is no police report," *id.* ¶ 54. She claimed to have done "research" showing that baby oil can transmit incapacitating drugs, *id.* ¶ 74, even though she allegedly "performed no such research, and even if she had, there is no scientific basis for asserting that baby oil could be infused with drugs to incapacitate anyone," *id.* ¶ 75. In fact, Mitchell herself contends that she "did not even know Burgess" at the time of her September 27, 2024 interview, Mitchell Motion at 20, which suggests that Mitchell lacked any basis whatsoever to believe in the truth of any of her statements during that interview. Assuming the truth of Combs's allegations, as the Court must at this stage, he has plausibly pleaded actual malice by Mitchell. Simply put, a person cannot engage in this sort of "rootless speculation" and then try to hide behind the shield of actual malice. *Prozeralik v. Cap. Cities Commc'ns, Inc.*, 626 N.E.2d 34, 39 (N.Y. 1993).[8]

## IV. Conclusion

For the above reasons, Nexstar's motion to dismiss is granted in part and denied in part, and Mitchell's motion to dismiss is denied in its entirety. Counsel for all parties are ordered to appear before the undersigned for a conference to discuss next steps in this case on September 17, 2026, at 2:00 p.m. At the scheduled time, counsel should call (855) 244-8681, access code 2302 755 2307. By September 10, 2026, the parties must meet-and-confer and submit a joint letter,

---

[8] At the end of her moving brief, Mitchell makes an unsupported request for "reasonable attorney fees and costs . . . due to insufficient pleading." Mitchell Motion at 27. Because the Court denies Mitchell's motion to dismiss, this request is denied as well.

not to exceed three pages, addressing (1) whether there is still a dispute regarding Nexstar's motion to compel Combs to produce discovery materials, and, if so, whether the scope of that dispute has changed; (2) whether the parties request a referral to the Court-annexed mediation program or, alternatively, to the Honorable Sarah L. Cave for a settlement conference; and (3) any other information that the parties believe may assist this Court in resolving the action.

The Clerk of Court is respectfully directed to close Docket Numbers 71, 75, 76, 84, and 107.

SO ORDERED.

Dated: September 4, 2026
New York, New York

JOHN P. CRONAN
United States District Judge